Howard E. HARMS, Respondent,

v.

INDEPENDENT SCHOOL DISTRICT NO. 300, LaCRESCENT, Minnesota, Petitioner, Appellant.

No. CX–88–2226.

Supreme Court of Minnesota.

Jan. 26, 1990.

Philip A. Gartner, Steven M. Hardy, Gartner, Shulman & Erwin, Ltd., Lake City, for appellant.

Michael J. Vanselow, Oppenheimer, Wolff & Donnelly, St. Paul, for respondent.

William F. Garber, Garber & Kaspari, St. Louis Park, for amicus curiae, Minnesota Federation of Teachers.

Joseph F. Flynn, Knutson, Flynn, Hetland & Deans, St. Paul, for amicus curiae, Minnesota School Boards Ass'n.

POPOVICH, Chief Justice.

Respondent teacher, who previously had been placed on unrequested leave of absence ("ULA") by appellant Independent School District No. 300, LaCrescent, Minnesota ("the District"), twice was not reinstated when the District reestablished a position. Instead, the District recalled two less senior teachers from ULA, refusing to realign its teachers to accommodate respondent. Respondent brought a declaratory judgment action to determine his right to recall and realignment under Minn.Stat.

§ 125.12, subd. 6b (1988). The trial court held the District need only recall a teacher from ULA for a specific open position and not realign in order to reinstate a more senior teacher. A court of appeals panel reversed, in a two-to-one decision, holding that seniority is to be protected on teacher recall, and in order to recall the most senior teacher on ULA, reasonable realignment may be necessary. *Harms v. Independent School Dist. No. 300*, 441 N.W.2d 522, 524–25 (Minn.App.1989). We affirm.

## I.

In August 1977, the District hired respondent Howard Harms as a teacher. He has a Minnesota teaching license, valid until 1991, in social studies, history, physical education, and coaching. During the 1985–86 school year Harms was a full-time social studies teacher at the LaCrescent Junior–Senior High School.

In March 1986, due to financial limitations, the District decided to reduce its staff for the 1986–87 school year by placing several teachers on ULA. Pursuant to this decision, the District adopted a plan that eliminated the junior-senior high school guidance and counseling program, which was staffed by Richard Kleppe and Mary Netzer during the 1985–86 school year. Kleppe began teaching in the District in 1969 and is licensed in guidance and counseling, vocational counseling, social studies, and business education, while Netzer was hired by the District in 1981 and is licensed in guidance and counseling, and social studies. Under the plan, Kleppe, a more senior teacher, was reassigned to respondent's full-time social studies position, and Harms, Netzer, and nine other teachers were placed on ULA. It is undisputed that respondent's placement on ULA and the accompanying realignment were proper.

In December 1986, the District decided to reestablish one counseling position at the junior-senior high school effective at the start of the 1987–88 school year. The District offered this position to Netzer. In a January 2, 1987 letter, Harms requested the District reassign Kleppe to this counseling position and recall himself—the most senior teacher on ULA—to his former social studies position. The District rejected respondent's request, maintaining it had no obligation to realign when reinstating teachers from ULA. Instead, the District decided to employ Netzer, who had previously held the counseling position and was the only teacher in the ULA pool licensed for this position. Netzer initially accepted this position, but later resigned.

On June 17, 1987, the District approved Netzer's resignation and decided to advertise to fill this vacancy because no teacher in its ULA pool was licensed in guidance and counseling. In a July 4, 1987 letter to the District, Kleppe objected to the District's decision to advertise the open counseling position and suggested he should be reassigned to his former counseling position. In August 1987, however, the District realigned its staff, assigning Jon Larson, who is licensed in art, political science and government, and guidance and counseling, and began teaching in the District in 1967, from an art position to the open counseling position. The District then reinstated James Little—who was hired by the District in 1980, is only licensed to teach art, was the least senior teacher on ULA, and was placed on ULA at the same time as Harms—from ULA to Larson's former art position. Little, like Netzer previously, was less senior than respondent.

On July 15, 1987, Harms commenced a declaratory judgment action, seeking a declaration that school districts are required by Minn.Stat. § 125.12, subd. 6b (1988) to reasonably realign when reinstating teachers from ULA to recall the most senior teachers. Harms also contended the District's refusal to reassign Kleppe to the open counseling position and to reinstate himself, the most senior teacher on ULA, to Kleppe's social studies position was a violation of subdivision 6b. Accordingly, Harms sought an order directing the District to realign its staff and reinstate him to a full-time social studies position.

On the parties' cross-motions for summary judgment, the trial court granted the District's motion. The court ruled Minn.

Stat. § 125.12, subd. 6b(e)[1] does not require teacher recall to be done according to seniority and thus did not reach the issue of whether respondent's requested realignments were reasonable. Harms appealed.

A court of appeals panel reversed and held that under Minn.Stat. § 125.12, subd. 6b(e), and *Strand v. Special School Dist. No. 1*, 392 N.W.2d 881, 885–86 (Minn.1986), the seniority of teachers being recalled from ULA should be protected by reasonably realigning personnel and positions. *Harms*, 441 N.W.2d at 524–25. The panel remanded to the trial court for a determination of the reasonableness of respondent's realignment requests. *Id.* at 525. The dissent distinguished between layoff and recall, stating subdivision 6b(e) does not provide protection of teacher seniority rights on reinstatement, and as a result there is no right to realignment. *Harms*, 441 N.W.2d at 525–26 (Randall, J., dissenting). We granted the District's petition for review on August 16, 1989, and briefing and oral arguments followed.

## II.

■ The standard of review applicable to a school board decision is whether it is fraudulent, arbitrary, unreasonable, not supported by substantial evidence on the record, not within its jurisdiction, or based upon an erroneous theory of law. *Ganyo v. Independent School Dist. No. 832*, 311 N.W.2d 497, 500 (Minn.1981); *Foesch v. Independent School Dist. No. 646*, 300 Minn. 478, 485, 223 N.W.2d 371, 375 (1974). Respondent contends the District's actions in this case were based upon an erroneous theory of teacher recall law.

The central issue is whether under Minn. Stat. § 125.12, subd. 6b(e), the applicable teacher reinstatement statute, school districts are required to take reasonable steps to realign personnel and positions in order to recall from ULA the most senior teachers. Appellant argues subdivision 6b(e)

permits recall for the specific opening without regard to teacher seniority. Harms asserts the subdivision requires recall of the most senior teacher on ULA even if reasonable realignment is necessary.

Although subdivision 6b(e) mentions "inverse order" of placement on ULA, we believe it is clear that by using this phrase the legislature intended "seniority." Hearings on H.F. 210, S.Comm. on Educ., 68th Minn.Leg., March 8, 1974 (comments of Sen. Conzemius, author of this language). The "inverse order" language has been considered interchangeable with seniority. Letter from Minnesota Attorney General's Office to Independent School District No. 623 (Aug. 12, 1985) at 3–4 ("A.G. letter"); *see also McManus v. Independent School Dist. No. 625*, 321 N.W.2d 891, 892–93 & n. 2 (Minn.1982). We already require protection of seniority when reducing teaching positions. *Strand*, 392 N.W.2d at 885–86; *see also Westgard v. Independent School Dist. No. 745*, 400 N.W.2d 341, 345 (Minn. App.1987) (extending *Strand* to school districts covered by Minn.Stat. § 125.12), *petition for rev. denied* (Minn. Apr. 17, 1987). The layoff and recall statutes are virtually identical. *Compare* Minn.Stat. § 125.12, subd. 6b(b) (1988) ("Teachers * * * shall be placed on unrequested leave of absence * * * in the inverse order in which they were employed by the school district."), *with id.* subd. 6b(e) ("Reinstatement shall be in the inverse order of placement on leave of absence."). In addition, we have often recognized the importance of seniority generally under Minn.Stat. §§ 125.12 & 125.17. *E.g., Roseville Educ. Ass'n v. Independent School Dist. No. 623*, 391 N.W.2d 846, 852 (Minn.1986); *Walter v. Independent School Dist. No. 457*, 323 N.W.2d 37, 43 (Minn.1982); *McManus*, 321 N.W.2d at 893.

We previously recognized that seniority is the primary consideration when reinstating teachers. In *Berland v. Special School Dist. No. 1*, 314 N.W.2d 809, 817

---

**1.** Subdivision 6b(e) provides, in relevant part: Teachers placed on unrequested leave of absence shall be reinstated to the positions from which they have been given leaves of absence or, if not available, to other available positions in the school district in fields in which they are licensed. Reinstatement shall be in the inverse order of placement on leave of absence.

Minn.Stat. § 125.12, subd. 6b(e) (1988).

(Minn.1981) (emphasis added and footnote omitted), we stated:

> These provisions set out in detail the rights of terminated teachers to be reinstated in order of *seniority* to the positions they formerly held or to other available positions "in fields in which they are licensed." \* \* \* [S]ection \* \* \* 125.12 \* \* \* demonstrates that the legislature can provide explicitly for terminated teachers to be recalled in order of *seniority.*

An attorney general's letter concluded:

> [R]einstatement in the 'inverse order' would logically result in reinstatement by seniority. \* \* \* [R]einstatement of teachers previously placed on unrequested leave of absence is to be based upon their respective seniority with the District \* \* \*.

A.G. letter, at 4–5. Since seniority is the overriding consideration in teacher layoff, we feel under the "inverse order" language this seniority principle should also be applied in teacher recall.

### III.

While seniority protection of teachers recalled from ULA is clear under Minn.Stat. § 125.12, subd. 6b(e), the more difficult question is whether a reasonable realignment requirement is the proper or preferable method of protecting seniority. Bumping[2] and realignment ensure the layoff of the absolutely least senior teachers possible, and the layoff statutes have been interpreted to give effect to the overriding policy of seniority. *Strand,* 392 N.W.2d at 885–86 (realignment); *Berland,* 314 N.W.2d at 812–13 (bumping). Realignment involves the reassignment of teachers to accommodate the most senior teacher on ULA. Realignment is possible because a "multiple licensed teacher must be subject to assignment in any subject area in which the teacher is qualified by license," *Strand,* 392 N.W.2d at 886, and because "each course offered is not a separate position which has to be assigned to the most senior

teacher licensed to teach it." *Brandhorst v. Special School Dist. No. 1,* 392 N.W.2d 888, 889 (Minn.1986).

■ We are being asked to extend our holding in *Strand* now to require reasonable realignment not only when placing teachers on leave, but also when recalling teachers from leave. In *Strand,* we held that in order to protect seniority rights in teacher layoffs under Minn.Stat. § 125.17, reasonable realignment of teachers and positions is required. 392 N.W.2d at 886. This duty to realign, however, was limited to where "practical and reasonable." *Id.* While we agree with the District that *Strand* only dealt with placing teachers on leave and a different subdivision applies to recall, we differ whether completely different principles apply when recalling teachers from leave. Instead, we agree with the court of appeals panel that the conditions supporting *Strand* and reasonable realignment, primarily the protection of teacher seniority rights, apply equally well to reinstatement and recall. We believe *Strand* should be extended to reinstatement, even if realignment on recall may be more difficult than realignment when placing teachers on leave.

The possibility of school district abuse by ignoring seniority and manipulating positions in order to recall a less senior teacher influences our decision to extend this realignment requirement. A school district, as appellant urges subdivision 6b(e) interpreted, could lay off several teachers one year, and then recall only certain less senior teachers in subsequent years by creating specific openings for which these less senior teachers, but not a more senior teacher, are licensed. In this case, though no manipulation is alleged, the District even realigned to create a new opening for which a teacher with less seniority than Harms was recalled. We agree with the court of appeals panel that "[a]bsent an obligation to reasonably realign prior to reinstatement, school districts could defeat

---

**2.** A "bump" is a direct exercise of authority by a more senior teacher about to lose his or her teaching position to a less senior teacher, with the more senior teacher moving into the less

senior teacher's position. Licensure and seniority are the only considerations in "bump" situations. *See* Minn.Stat. § 125.12, subd. 6b(b).

the goal of protecting seniority by manipulating the layoff and recall process to eliminate senior teachers." *Harms*, 441 N.W.2d at 524. This can best be rectified through protection of seniority rights, and a reasonable and practical realignment requirement on recall.

Thus, under subdivision 6b(e) the most senior teacher on ULA is entitled to be recalled first, to his or her former position if it is available, but then, after reasonable realignment, to another position for which the teacher is licensed. Reasonable realignment is the most effective—and possibly the only—way to protect teacher seniority on recall.

### IV.

Since we have determined that reasonable realignment is required when reinstating teachers from ULA, it is necessary to carefully define what is "reasonable realignment." We established the following factors in *Strand* which should be examined in layoff realignments:

> [T]he teacher's length of service, the duration and scope of the teacher's license, the school district's needs reflecting the welfare of the students and the public, and the ease of reassignment or realignment of course schedules to facilitate a retention of the most senior teachers.

392 N.W.2d at 885. In addition, each case is to be decided on its own merits, and any realignment plan should be practical and reasonable. *Brandhorst*, 392 N.W.2d at 889; *Strand*, 392 N.W.2d at 886. Realignment does not require consideration of every possible configuration, but only reasonable and good faith attempts to accommodate the most senior teachers. In using the above factors, school boards do have some discretion—in furtherance of a "practical and reasonable" realignment. *See, e.g., Strand*, 392 N.W.2d at 885 ("public school districts must be accorded sufficient flexibility to effectively administer the schools"); *Destache v. Independent School Dist. No. 832*, 434 N.W.2d 270, 273–74 (Minn.App.1989). Because realignment on recall often will not be significantly different in form from layoff realignment, we

extend the *Strand* factors as equally applicable to recall.

We realize, however, that realignment on recall may differ from layoff realignment in one significant way. Placement of teachers on ULA occurs only once each year, with final notice required by June 1st. Minn.Stat. §§ 125.12, subds. 3, 6b & 6b(j) (1988). This early determination eliminates the disruption of classrooms and schedules potentially caused by realignment for the following school year. Amicus School Boards Association admits that realignment on layoff "has proven manageable." Teacher recall, however, can occur at any time during the school year for any number of reasons. Vacancies during the school year, unlike layoffs at the end of the school year, are usually not controlled or structured by school districts. As a result, realignment on recall is potentially much more burdensome because it may be done several times each school year, depending on the size of a school district. A teacher being reassigned from one classroom to another could disrupt students and classes.

Because of this significant difference, an additional factor needs to be considered when realigning on recall, which is when an opening occurs. If an opening occurs during a school year, one choice may be to immediately recall a teacher who previously held or is licensed for the specific opening. An alternative may be to hire a substitute teacher, waiting to recall and realign for the next school year or during a quarter or semester break. *See* Minn.Stat. § 123.35, subd. 5 (1988). Other situations may arise on recall when realignment would be impractical and unreasonable. Even Amicus Minnesota Federation of Teachers agrees that "[a]n overall rule should not be created, causing recall which disrupts classes." In light of the need for continuity, it may be unreasonable to realign during a school year when the realignment would disrupt classes other than the position to be filled, even though the same realignment would be reasonable if it occurred at the end of a school year effective for the next school year.

We, however, see nothing especially burdensome in other situations. School boards currently realign each spring when reducing their teaching staffs for the next school year. When reinstating teachers for the next school year, realignment would be basically the same. In the present case, the District could have reasonably realigned when it decided in December to add a teacher for the next school year. In fact, the District did realign to reinstate a less senior teacher. Thus, in making a "reasonable realignment" determination for teacher recall, school boards should consider, in addition to examining the *Strand* factors, the time of the school year and the amount of disruption of classes entailed other than for the position being recalled.

A related distinction between recall and layoff is that the layoff procedures have a notice and hearing requirement whereby, once a year, the reasonableness of a district's proposed realignment plan can be reviewed in an administrative hearing, if a teacher to be laid off so requests. *See* Minn.Stat. §§ 125.12, subds. 3, 4 & 6b(j) (1988). There are no such hearing procedures when recalling teachers. Nevertheless, if the most senior teacher is recalled from ULA following a reasonable realignment, there will be no need for a hearing. This distinction does not indicate to us that seniority and realignment are the primary concerns for teacher layoffs but not for recalls. We urge teacher exclusive representatives and school boards to work out a process by which the reasonableness of realignments can be resolved without the necessity of resorting to the judicial system. The legislature itself may wish to address this aspect of the process should experience indicate problems not now contemplated.

■ In this case, Harms has been able, in a declaratory judgment action, to develop a record sufficient to enable us to review the reasonableness of the requested realignment. We are troubled though that this case did not reach us until two and one-half years after it was filed. The appropriate procedure to challenge a school board reinstatement and realignment decision hereafter is by a writ of certiorari. Minn.Stat. § 480.04 (1988). The record shall include: (1) any notice of the vacancy or position to be filled and any material relating to the determination of what position is to be filled; (2) all teacher correspondence requesting recall and realignment; (3) any realignment proposals considered; (4) reasons for adoption or rejection of each such proposal; (5) any recommendation of the school administration to the school board; and (6) any school board action taken together with reasons for the selection made. Review of the writ of certiorari shall be based on the record made before the school board and shall be by the court of appeals. Minn.Stat. § 480A.06, subd. 3 (1988); *Strand,* 392 N.W.2d at 883. A teacher challenging a realignment in which he or she was not recalled has the burden of showing there was no good faith attempt by the school district to reasonably and practically realign in the recall process.

## V.

Before determining whether Harms' realignment requests were reasonable, we must first determine whether we may make such a determination. This normally is a question for a trial court to decide. The trial court here, however, ruled that the District had no obligation to realign and thus did not reach this issue. Although the court of appeals panel found in favor of Harms, it remanded to the trial court for a determination of whether Harms' requested realignments were reasonable.

■ An appellate court may decide an issue not determined by a trial court where that question is decisive of the entire controversy and where there is no possible advantage or disadvantage to either party in not having a prior ruling on the question. *Holen v. Minneapolis–St. Paul Metro. Airports Comm'n,* 250 Minn. 130, 135, 84 N.W.2d 282, 286 (1957); *see also* Minn.R. Civ.App.P. 103.04 (appellate court may "take any * * * action as the interest of justice may require"). No party is disadvantaged when the facts are undisputed. *Holen,* 250 Minn. at 135, 84 N.W.2d at 286.

In this case, the facts are undisputed, with the parties only disagreeing on the inference or conclusion of law to be drawn from the facts as to whether respondent's requested realignments were reasonable. The District did not indicate any additional evidence that may be needed on this issue. Therefore, we may make the reasonableness determination and bring this litigation to a conclusion. *See Heruth v. Independent School Dist. No. 11*, 434 N.W.2d 470, 473 (Minn.App.1989) (appellate court holding teacher realignment would be reasonable, without district court determination), *pet. for rev. denied* (Minn., March 29, 1989).

We thus consider whether the realignments Harms requested were reasonable as a matter of law. The District did in fact realign when the counseling position opened for a second time, although it felt the law did not require it to realign by seniority. Consequently, the District completely ignored Harms' licensure, greater seniority, and his realignment proposal.

While school districts have some discretion when realigning teachers, *Westgard*, 400 N.W.2d at 345, four facts render respondent's proposal entirely reasonable using the *Strand* and the time of the school year realignment factors: 1) time of realignment (for the next school year, *i.e.*, no disruption); 2) the small number of teachers moved (two or three); 3) returning *all* the teachers to their long-held positions, instead of new positions; and 4) protecting Harms' seniority rights. At the time of the initial counseling opening, the requested realignment would have moved Kleppe back to the new counseling position where he had taught the previous 17 years, with respondent being reinstated to the social studies position he had held for the nine prior years. Under respondent's realignment proposal, after Larson, who had never previously held a counseling position, was realigned to counseling, Larson would go back to teaching art, Kleppe to counseling, and respondent to social studies. Respondent presented realignment proposals that are simple, straightforward, and reasonable. The District is ordered to reasonably realign and reinstate respondent.

Affirmed as modified.