STATE OF MINNESOTA

IN SUPREME COURT

A13-1803

Court of Appeals                                                                        Gildea, C.J.
                                                                          Took no part, Hudson, J.

State of Minnesota,

                    Respondent,

vs.                                                                         Filed: December 9, 2015
                                                                        Office of Appellate Courts

Richard Ellis Hill,

                    Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, G. Paul Beaumaster, Assistant Dakota County Attorney, Hastings, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Charles F. Clippert, Special Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      A rebuttable presumption of contamination for controlled substances that the St. Paul Police Crime Lab handled, but did not subject to testing, is not required to vindicate the right to substantive due process under the state and federal constitutions.

1

2.      The adoption of such a presumption under our inherent judicial authority to regulate and supervise the rules governing the admission of evidence in the district courts is not required to ensure the fair administration of justice.

Affirmed.

O P I N I O N

GILDEA, Chief Justice.

This case presents the question of whether we should adopt a rebuttable presumption of contamination for controlled substances that the St. Paul Police Crime Lab ("Crime Lab") handled and that the Minnesota Bureau of Criminal Apprehension ("BCA") later tested. The State charged appellant Richard Ellis Hill with aiding and abetting first-degree sale of a mixture of a controlled substance of ten grams or more, in violation of Minn. Stat. § 155.021, subd. 1(1) (2014), in connection with the sale of methamphetamine. Hill waived his right to a jury and submitted his case to the court. During the court trial, Hill objected to the admission of the BCA results that confirmed that the substance was methamphetamine. Hill argued the BCA test results were unreliable because the contents of the bags might have been contaminated while the bags were in the custody of the Crime Lab, which was investigated for deficiencies in its quality-assurance controls. Applying a chain-of-custody analysis, the district court rejected Hill's contamination argument. Hill was subsequently convicted of the charged offense. The court of appeals affirmed, *State v. Hill*, No. A13-1803, 2014 WL 6608809, at *5 (Minn. App. Nov. 24, 2014), and we granted review.

2

On appeal, Hill argues that we should adopt a rebuttable presumption of contamination for controlled substances handled by the Crime Lab based on either the right to substantive due process or our inherent judicial authority. Because such a presumption is not necessary to vindicate a defendant's right to substantive due process or to ensure the fair administration of justice, we decline to adopt such a presumption and affirm.

This case arises from a controlled buy the Dakota County Drug Task Force ("Task Force") conducted through the use of a confidential informant. Hill was arrested after the transaction, and following that arrest, the Task Force retrieved two bags of suspected methamphetamine that had been sold to the confidential informant. The Task Force marked these two bags for identification as Items 9A and 9B.[1]

The Task Force transported each seized item in its own sealed evidence bag back to the Task Force's office. There, a Task Force evidence technician subjected a portion

---

[1] When the police arrested Hill, they recovered two additional bags of suspected methamphetamine that were not part of the sale. After marking the bags as Items 5 and 7, the police sent them to the Crime Lab for testing. Although Hill makes no claims regarding Item 7, he does claim that Item 5 supports an inference of contamination because it allegedly gained weight while at the Crime Lab. The criminalist at the Crime Lab reported that Item 5 weighed 0.45 grams, while the criminalist at the BCA reported that Item 5 weighed 0.452 grams. Hill admits in his brief, however, that "[t]he [weight] difference may have been the result of the laboratories weighing evidence to hundredths v. thousandths of grams." The district court made no findings on the question of whether there was in fact any weight gain because Hill failed to raise the weight-gain issue in the district court. We generally do not consider issues that were not raised in the district court. *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). This is especially true when the record is not fully developed. *State v. Gauster*, 752 N.W.2d 496, 508 (Minn. 2008); *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). Because Hill failed to raise the weight-gain issue in the district court and the record is not fully developed, we do not consider the weight-gain issue, and no further discussion of Items 5 and 7 is necessary.

3

of the contents of each bag of suspected methamphetamine to a preliminary narcotics identification kit ("NIK") test. The contents of each bag tested positive for the presence of methamphetamine. The remainder of the substances that were not NIK-tested were transferred to a new bag that was then sealed, heat sealed, initialed, and placed back into the Task Force evidence bag along with the bags that had originally held the substances. The evidence technician then brought the evidence bag to the secure property room.

Later that same day, Items 9A and 9B were retrieved and transferred to the Crime Lab for corroborative testing. The criminalist who performed the testing determined that collectively, Items 9A and 9B had a net weight of 12.13 grams. The criminalist then tested the substances by removing a "small piece" from each and placing the small subsample into a vial that was then run through the Crime Lab's gas chromatograph-mass spectrometer. The criminalist sealed the untested substance remaining from each item into a new evidence bag, and the bags were returned to the Task Force property room.

The record reflects that the Task Force subsequently retrieved Items 9A and 9B from the Task Force property room in response to the county attorney's request for further testing. The Task Force transported the items to the BCA, an institution "accredited"[2] by the American Society of Crime Laboratory Directors Laboratory Accreditation Board ("ASCLD"). No changes were noted to the condition of the items or

---

[2]  "Accreditation" was described at trial as "a voluntary program . . . where all aspects of the laboratory, such as the employees, the management[,] [the] equipment, the building itself, [and] all of [the] operating procedures and protocols and quality assurance standards are . . . evaluated by [the] ASCLD lab . . . to make sure that [the lab is] meeting accepted standards in the field of forensic science."

their seals at that time. A BCA criminalist thereafter removed the evidence from the BCA's drug vault and performed an analysis of the items. Hill does not challenge the BCA's handling or testing of the items, and the record reflects that the BCA's handling procedure was standardized, mostly in writing, and sanctioned by the ASCLD as part of the BCA's accreditation process.

Following the prescribed BCA testing procedure, the BCA criminalist obtained gas chromatograph-mass spectrometer test results that confirmed the presence of methamphetamine in both Items 9A and 9B. BCA testing further produced a negative result for the presence of "other controlled substances, such as heroin or cocaine or other common street drugs[.]" The BCA criminalist obtained a net weight of 7.207 grams for Item 9A and a net weight of 4.818 grams for Item 9B. Collectively, the net weight of Items 9A and 9B, "[c]ontaining methamphetamine," was 12.025 grams.

The State charged Hill with various felony drug offenses. Hill waived his right to a jury trial and submitted his case to the court. The State did not offer the tests from the Crime Lab but relied on the BCA test results. Over Hill's foundational reliability objections, the district court admitted the BCA's test results. The district court first applied a chain-of-custody analysis to the Crime Lab's handling of the controlled substances that were not subject to testing at the Crime Lab. Concluding that the untested substances were not likely contaminated while at the Crime Lab, the court applied the

second prong of the *Frye-Mack* test to the BCA's testing procedure[3] and determined the results to be foundationally reliable. The district court convicted Hill of aiding and abetting the first-degree sale of a mixture of a controlled substance of ten grams or more, in violation of Minn. Stat. § 155.021, subd. 1(1).

On appeal, Hill argued the district court erroneously applied the chain-of-custody standard in addition to the second prong of the *Frye-Mack* test in admitting the BCA test results of the controlled substances. The court of appeals affirmed Hill's conviction. *Hill*, 2014 WL 6608809, at *5. The court held that "the district court correctly concluded that both the second prong of *Frye-Mack* and the chain-of-custody standard apply," and that the district court properly applied the chain-of-custody standard. *Id.* at *2. We granted Hill's petition for review.

On appeal to our court, Hill argues in his brief that because the evidence was processed through the Crime Lab, the evidence was not reliable and should not have been

---

[3] Minnesota law provides that the "two-pronged *Frye-Mack* test must be satisfied" in order for scientific evidence to be admissible. *State v. Bailey*, 677 N.W.2d 380, 398 (Minn. 2004) (citing *State v. Traylor*, 656 N.W.2d 885, 891 (Minn. 2003)). To satisfy the first prong, the proponent must establish that the scientific technique being used to generate evidence is "generally accepted within the relevant scientific community." *State v. Roman Nose*, 649 N.W.2d 815, 818 (Minn. 2002). But when the scientific technique at issue has gained general acceptance, as Hill conceded in this case, district courts are directed to focus on the second prong. *Id.* at 819. To meet the second prong, the proponent must prove that the generally accepted methodology "produced reliable results in the specific case." *Bailey*, 677 N.W.2d at 397-98 (citing *Goeb v. Tharaldson*, 615 N.W.2d 800, 816 (Minn. 2000)). Under this prong, the proponent must show that the testing procedures have not introduced "contaminants" that would have "adversely affected the reliability of the test." *State v. Dille*, 258 N.W.2d 565, 568 (Minn. 1977). Once the proponent has met this burden, it is incumbent upon the defendant to come forward with some evidence assailing the testing procedure's reliability. *Id.*

admitted. The State responds that the district court properly applied both a chain-of-custody analysis and the *Frye-Mack* foundational reliability standard prior to admission of the evidence. The district court analyzed the Crime Lab's handling of the controlled substances that were not subjected to testing at the Crime Lab under a chain-of-custody standard. *See State v. Johnson*, 307 Minn. 501, 505, 239 N.W.2d 239, 242 (1976) (noting that admissibility of evidence requiring chain-of-custody authentication is not contingent upon negating "all possibility of tampering or substitution, but rather only that it is reasonably probable that tampering or substitution did not occur"). And the court applied the foundational reliability standard from *Frye-Mack* to the testing the BCA performed. *See State v. Bailey*, 677 N.W.2d 380, 397-98 (Minn. 2004) (citing *Goeb v. Tharaldson*, 615 N.W.2d 800, 816 (Minn. 2000)) (noting that to satisfy foundational reliability under *Frye-Mack*, the proponent of the evidence must show that the generally reliable methodology "produced reliable results in the specific case"). Hill confirmed at oral argument that he is not asking for a new trial because the district court improperly applied either the chain-of-custody or foundational reliability standard, and our review of the record demonstrates that the district court properly applied both standards. Hill asks instead that we adopt a new standard that would presume that all evidence processed through the Crime Lab is contaminated and inadmissible unless the State can prove the absence of contamination. We turn to that question now.

I.

We turn first to Hill's argument that a rebuttable presumption of contamination for controlled substances handled by the Crime Lab is necessary to vindicate his right to substantive due process.[4]   Whether the absence of such a presumption violated Hill's right to due process is a constitutional question that we review de novo.  *State v. Netland*, 762 N.W.2d 202, 207 (Minn. 2009).

The United States and Minnesota Constitutions each "guarantee a criminal defendant the right to due process."  *State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012) (plurality opinion); *accord* U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7; *see also State v. Krause*, 817 N.W.2d 136, 144 (Minn. 2012) (noting that the protections of due process provided under the Minnesota Constitution are "identical" to those guaranteed under the United States Constitution (quoting *Sartori v. Harnishfeger Corp.*, 432 N.W.2d 448, 453 (Minn. 1988))).   It is, indeed, axiomatic that every criminal defendant has a "right to be treated with fundamental fairness . . . ."  *State v. Richards*, 495 N.W.2d 187, 191 (Minn. 1992); *see Manson v. Brathwaite*, 432 U.S. 98, 113 (1977) ("The standard, after all, is that of fairness as required by the Due Process Clause of the

---

[4]   Hill did not raise this argument in the district court.  Generally, we do not consider issues that were not raised below.  *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). We may decide an issue not determined by the district court, however, when "there is no possible advantage or disadvantage to either party in not having a prior ruling on the question."  *Harms v. Indep. Sch. Dist. No. 300, LaCrescent*, 450 N.W.2d 571, 577 (Minn. 1990).  When the question involves a purely legal issue and the State has briefed that issue, our consideration of the question does not prejudice the State.  *Woodhall v. State*, 738 N.W.2d 357, 363 n.6 (Minn. 2007).  Here, we consider the issue in question because it involves a purely legal question and it was briefed by the State.

Fourteenth Amendment."). Like other courts, however, we are reluctant "to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended." *Netland*, 762 N.W.2d at 208 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

We have interpreted the substantive component of the right to due process as protecting an individual from "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."[5] *In re Linehan*, 594 N.W.2d 867, 872 (Minn. 1999) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). This protection limits what the government may do in both its legislative and its executive capacities. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The criterion for identifying what governmental conduct is "fatally arbitrary," however, differs "depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Id.*

In the context of executive action, which is the type of action at issue here, substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937)." *United States v. Salerno*, 481 U.S. 739, 746 (1987). Our precedent further establishes that "[o]nly the most extreme instances of governmental misconduct" can

---

[5] By contrast, procedural due process, in general, requires that a defendant have "notice and an 'opportunity to be heard at a meaningful time and in a meaningful manner.' " *Rew v. Bergstrom*, 845 N.W.2d 764, 786 (Minn. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

satisfy the "exacting" shocks-the-conscience standard, with these acts often evincing deliberate and unjustifiable injurious intent. *Netland*, 762 N.W.2d at 210 (quoting *Mumm v. Mornson*, 708 N.W.2d 475, 487-88, 490 (Minn. 2006)); *see also Lewis*, 523 U.S. at 846 ("[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' ") (quoting *Collins*, 503 U.S. at 126, 129 (other citations omitted)).[6]

In addition, "implicit in any concept of ordered liberty" is the principle that "a State may not knowingly use false evidence" to obtain a conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To that end, substantive due process prohibits the admission of eyewitness identifications the police obtained through unnecessarily suggestive procedures that create a substantial likelihood of misidentification. *Perry v. New*

---

[6] *Compare Rochin*, 342 U.S. at 172 (concluding that the police's unlawful breaking into the defendant's home, forcible attempt to extract evidence from the defendant's mouth, and the involuntary pumping of the defendant's stomach contents was behavior that shocked the conscience), *and Brown v. Mississippi*, 297 U.S. 278, 282-85, 286 (1936) (concluding that "[i]t would be difficult to conceive of methods more revolting to the sense of justice than" the torturous whipping used by the deputy to compel the confessions of petitioners, which was "a clear denial of due process"), *with Whitley v. Albers*, 475 U.S. 312, 320 (1986) (holding that, in the context of a prison guard's endeavor to neutralize a dangerous prison riot, deliberate indifference was insufficient to shock the conscience; rather, the question was "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033 (1973))), *and Breithaupt v. Abram*, 352 U.S. 432, 437 (1957) ("[A] [routine, everyday] blood test taken by a skilled technician," even while the petitioner was unconscious, "is not such conduct that shocks the conscience." (citation omitted) (internal quotation marks omitted)), *and Mumm*, 708 N.W.2d at 487, 490 (applying the "*Lewis* intent-to-injure standard," *Lewis*, 523 U.S. at 836, 840, 849, in concluding that a police officer's unnecessary use of deadly force to halt a dangerous vehicle in a high speed chase, even if in "poor judgment," did not automatically shock the conscience; the standard is "much higher . . . than . . . objective unreasonableness").

*Hampshire*, ___ U.S. ___, ___, 132 S. Ct. 716, 724 (2012); *Neil v. Biggers*, 409 U.S. 188, 198-200 (1972); *State v. Cogshell*, 538 N.W.2d 120, 122 (Minn. 1995) ("Due process is violated by [a photo] display if the display was so unnecessarily suggestive as to create a substantial likelihood of irreparable misidentification.").

Consistent with this precedent, we must first identify "the precise nature of the constitutional right asserted by [Hill] and the government conduct allegedly depriving [him] of that right." *Netland*, 762 N.W.2d at 208 (citing *Frank v. Maryland*, 359 U.S. 360, 363 (1959)). Hill contends the State "violated fundamental principles of due process when it established a crime laboratory that operated without policies, procedures, checks or controls and processed . . . evidence through that laboratory." In other words, Hill argues that the State's actions "shock[] the conscience," *Rochin*, 342 U.S. at 172. Hill also argues that the substandard operations of the Crime Lab created a substantial likelihood of contamination that is akin to the use of unnecessarily suggestive eyewitness identification procedures that create a "substantial likelihood of irreparable misidentification," *Biggers*, 409 U.S. at 198-200.

To address these alleged violations of substantive due process, Hill asks us to adopt a rebuttable presumption that all evidence handled by the Crime Lab is contaminated. To overcome such a presumption, the State would be required to prove by a preponderance of the evidence that contamination had not occurred. Hill contends that support for such a presumption can be found in *Ex Parte Coty*, 418 S.W.3d 597 (Tex. Crim. App. 2014), and *Commonwealth v. Scott*, 5 N.E.3d 530 (Mass. 2014). We disagree.

11

In both *Coty* and *Scott*, recurring insidious and intentional misconduct of a particular state actor gave rise to the need to presume unreliability. The issue in those cases, in other words, was not substandard laboratory operations.[7]

For example, in *Coty* the court adopted its burden-shifting presumption in direct response to the intentional misconduct of a specific laboratory technician who committed at least two instances of "dry labbing," an illicit practice in which a technician uses evidence tested in one case to falsely support a finding in another case. 418 S.W.3d at 598. Under the burden-shifting presumption adopted by the court in *Coty*, the defendant must first show:

> (1) the technician in question is a state actor, (2) the technician has committed *multiple instances of intentional misconduct* in another case or cases, (3) the technician is the same technician that worked on the [defendant's] case, (4) the misconduct is the type of misconduct that would have affected the evidence in the [defendant's] case, and (5) the technician handled and processed the evidence in the [defendant's] case within roughly the same period of time as the other misconduct.

*Id.* at 605 (emphasis added). If the defendant satisfies this initial burden, he has proven "the errors could have resulted in false evidence being used in [his] case" and the burden

---

[7] This is also true of the cases cited in *Coty*. *See, e.g.*, *In re Investigation of W. Va. State Police Crime Lab., Serology Div.*, 445 S.E.2d 165, 166-68 (W. Va. 1994) (distinguishing a "pattern and practice" of insidious, "intentional and systematic subversion of the criminal justice process" from the "relatively minor," unintentional, and "occasional" errors of other serologists, the latter of which did not warrant a presumption of invalidity); *In re Investigation of W. Va. State Police Crime Lab., Serology Div.*, 438 S.E.2d 501, 503 (W. Va. 1993) (recounting a technician's "long history of [intentionally] falsifying evidence in criminal prosecutions"); *State v. Roche*, 59 P.3d 682, 686 (Wash. Ct. App. 2002) (involving intentional chemist misconduct consisting of pilfering, purifying, and self-medicating with heroin samples, including use while on the job, as well as suspected dry labbing).

shifts to the State to offer evidence demonstrating that the technician committed no such intentional misconduct in the defendant's case. *Id.* The *Coty* court explained that the above-described factors and process "properly limit the likelihood that a defendant will be convicted based on false evidence without unfairly setting aside convictions obtained by the State." *Id.* at 606.

The Massachusetts Supreme Court in *Scott* adopted a presumption of misconduct in cases handled by a specific crime lab technician who had committed various forms of egregious misconduct on numerous occasions, including dry labbing, turning negative results into positive results, and intentionally contaminating evidence. 5 N.E.3d at 535-36. Of concern to the *Scott* court in fashioning its presumption of misconduct for defendants seeking to vacate a guilty plea was the fact that the technician was unable to recall the cases in which she had engaged in intentional misconduct and those in which she had not. *Id.* at 544. Given the magnified culpability of the technician's conduct, the likelihood or even certainty of inaccurate test results, and the nearly impossible task facing defendants of establishing that the technician committed misconduct in their particular case, the *Scott* court concluded that defendants should receive the benefit of a presumption of misconduct. *Id.* at 544-45.

The circumstances of Hill's case are not comparable to the circumstances in *Coty* and *Scott*. The district court found no evidence of bad faith, malicious intent, or intentional misconduct on behalf of the Crime Lab as a whole or the individuals who handled the substances in the Crime Lab. To the contrary, the district court found that "the evidence presented indicates proper measures were taken during the handling of the

evidence to avoid contamination of the . . . substances" that were not subjected to testing. And the court said that the "process followed" in the Crime Lab "does not suggest contamination occurred in this case or even was a likely possibility." Furthermore, the court found that the handling procedure, being "remarkably similar" to that used at the accredited BCA laboratory, was calculated to "ensure a contaminant free environment."[8]

Our review of the record persuades us that unlike cases involving a substantive due process violation, here there is neither evidence of palpable harmful intent nor blatantly egregious behavior that meets the shocks-the-conscience standard. Moreover, the Crime Lab's procedure for handling the untested controlled substances did not create a "substantial likelihood" of contamination, and therefore there is no likelihood that Hill was convicted based on false evidence.[9] Accordingly, the "strong medicine" justified by

---

[8] Although it is certainly true that evidence demonstrating the absence of a standardized, written procedure, controls, and in-depth scientific training would generally impugn the trustworthiness of the Crime Lab's handling procedure, Hill had the opportunity to, and in fact did, submit such evidence to the trier of fact for consideration.

[9] We need not decide whether Hill's right to substantive due process would have been violated had the State offered as evidence the controlled substances that were subjected to testing at the Crime Lab and/or the results of the Crime Lab's testing. The district court found that Crime Lab criminalists had a complete lack of understanding of the processes and procedures generally accepted for gas chromatography-mass spectrometry analysis. This deficient understanding led to "abuse" of the delicate machinery that caused it to build up "controlled substance residue" and occasionally become "plugg[ed]." The record supports the court's concerns about the reliability of the controlled substances that were subjected to testing at the Crime Lab and the results of that testing.

14

the facts of *Coty* and *Scott* is simply not warranted here.[10]  *Coty*, 418 S.W.3d at 606.  We therefore hold that Hill's right to due process does not compel our adoption of a presumption of contamination of the substances handled at the Crime Lab.

II.

Hill contends that even if we conclude that constitutional principles do not require the rebuttable presumption he proposes, we should nevertheless adopt such a presumption pursuant to our supervisory powers to ensure the fair administration of justice.  It is true that "we have the inherent judicial authority to regulate and supervise the rules that govern the admission of evidence in the lower courts."  *State v. Obeta*, 796 N.W.2d 282, 287 (Minn. 2011) (citing *State v. McCoy*, 682 N.W.2d 153, 160 (Minn. 2004)).  We have relied on this "supervisory power" to decide "important evidentiary issues with statewide impact."  *Id.*; *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994); *State v. Lefthand*, 488 N.W.2d 799, 801-02 (Minn. 1992).  But we have steadfastly held that these powers are invoked only in "exceptional circumstances."  *Roman Nose v. State*, 845 N.W.2d 193, 201 (Minn. 2014) (quoting *Beecroft*, 813 N.W.2d at 846).  We see no occasion to invoke those powers here.

Unlike *Scales* and *Lefthand*, the issue at hand does not present statewide implications.  Instead, it is limited to a single testing laboratory.  Furthermore, in both *Scales* and *Lefthand*, we acted in response to the State's refusal to heed admonitions with

---

[10]  Because we conclude that there has been no substantive due process violation, we need not decide whether a procedural remedy like shifting the burden of proof is available for substantive due process violations.

15

respect to matters we had identified as necessary for the vindication of a criminal defendant's rights. *Scales*, 518 N.W.2d at 592; *Lefthand*, 488 N.W.2d at 801-02. Hill, on the other hand, has not offered any evidence to suggest that the Crime Lab persisted in substandard operations despite our warnings. *See State v. Dominguez-Ramirez*, 563 N.W.2d 245, 257 (Minn. 1997) (refusing to exercise our supervisory powers where the State had not "deliberately ignore[d] our prior directives"). Additionally, the Legislature has since taken action to address the concerns of substandard crime lab operations. *See* Minn. Stat. § 299C.157 (2014). Accordingly, we conclude that the invocation of our supervisory powers to adopt the requested presumption of contamination is not required to ensure the fair administration of justice.

Our holding today should not be read to condone in any way the Crime Lab's past operations. Rather, our holding reflects only that the conduct at issue in this case did not rise to the exacting level of a substantive due process violation or necessitate the presumption of contamination that Hill requests.

Affirmed.


HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

16