CORNELIUS GAHAGAN v. AERMOTOR COMPANY.[1]

CONNOR GAHAGAN v. SAME.

January 19, 1897.

Nos. 10,256—(137).

**Negligence—Respondeat Superior.**

In determining whether the doctrine of respondeat superior applies, the test is whether, with reference to the matter out of which the alleged wrong sprung, the person sought to be charged had the right, under the contract of employment, to control, in the given particular complained of, the action of the person doing the wrong. Rait v. New England F. & C. Co., 66 Minn. 76, followed.

**Same—Question for the Jury.**

*Held* that, in this case, this was, under the evidence, a question for the jury.

**Same—Damages.**

The injury to a boy aged between eight and nine years consisted of the mangling of the ends of the ring and middle fingers of the left hand, so as to require their amputation at or near the first joint. *Held* that, in the absence of any evidence of special or peculiar damages, a verdict in favor of the minor for $1,800 was excessive.

[1] Reported in 69 N. W. 914.

Appeal in each case by defendant from an order of the district court for Fillmore county, Whytock, J., denying a motion for a new trial. Affirmed in first action and modified in second action.

The first paragraph of the agency contract referred to in the opinion was as follows:

"And said sales agent agrees as follows: 1st. To do all the business pertaining to selling aermotors, towers, grinders, and repairs, to receive all goods shipped to him under this agreement, to pay freight and expressage on such goods from Chicago, and to keep them well housed and in good order until sold, free of taxes and all charges to said company, and to be governed by the printed instructions on the back of this contract, which are hereby referred to and made part of this contract, and the instructions of the Aermotor Company."

*W. E. Todd*, for appellant.
*John Q. Farmer* and *John A. Lovely*, for respondents.

MITCHELL, J. These actions were brought by the respective plaintiffs to recover damages caused by the negligence of the defendant,—the one by the infant for personal injuries to himself, and the other by his father for loss of his son's services resulting from the same injuries. Both actions were tried together and resulted in verdicts for the plaintiffs,—in favor of the infant for $1,800, and in favor of the father for $400.

The negligence charged was the erection and leaving unguarded, in a public street, a windmill, calculated to attract the attention and invite the interference of young children, ignorant of the dangers to which the cogwheels and gearing exposed them when the mill was set in motion by the wind. The evidence tended to show that the mill was set up by one Frankson, assisted by one Conklin, and no point is made but that the evidence justified the jury in finding that they were guilty of negligence.

The main question in the case was and is whether the relation between the defendant and Frankson was such that the doctrine of respondeat superior applies, so as to make the former liable for the negligence of the latter. This depends entirely upon the terms of the so-called "agency contract" (Exhibit E), in connection with those portions of Frankson's testimony bearing on the manner in which the business was actually carried on.

The defendant was a foreign corporation, whose principal place

of business was in the city of Chicago, where its mills were manufactured, and whence they were shipped to their agents in different parts of the country. By the contract referred to the defendant appointed Frankson its "sales agent," to canvass and sell its mills in certain territory in southern Minnesota, and northern Iowa. It is too long to be quoted in full, without which it is impossible to fully understand the exact relation which it created between the parties. It is unnecessarily prolix, somewhat involved and obscure in its provisions, abounds in repetitions, and contains some apparent contradictions. Many of its provisions tend to indicate that its object was to constitute Frankson a factor to sell on commission, upon the terms and subject to the conditions and limitations therein specified, but otherwise to leave him to carry on the business in his own way, free from any right of control or direction on the part of the defendant. But the last clause of the first paragraph will not reasonably admit of any other construction than that Frankson was to be governed by any instructions which the defendant might give as to the manner in which the business should be conducted,—in other words, that under this contract of employment the defendant had a right to direct the action of Frankson by any instructions it might give as to the manner in which he should conduct the business, not inconsistent, of course, with the express terms of the contract itself.

If this was so, then defendant had the right to control and direct his acts as to the manner in which the mills should be advertised, as, for example, setting up samples to attract public attention to them. His testimony tends to prove that he did receive some instructions from the defendant outside of the contract itself, and that he complied with these instructions, especially in the matter of advertising. It also appeared from his testimony, that setting up sample mills was a common way of advertising the business, and that this was at least known to the company. It also appears that this particular mill, having a stub tower, was especially adapted to such a purpose, and it is fairly inferable that, when Frankson ordered it, the defendant knew that he intended to set it up as a sample mill. But if the setting up of such a mill was within the scope of his agency, and if in that particular the defendant had the right to control his action, it is wholly immaterial whether it knew either of his setting it up or expressly directed him to do so.

In determining whether the doctrine of respondeat superior applies, the decisive test is the right to control the action of the person doing the alleged wrong in respect to the manner in which the work shall be done. In the recent case of Rait v. New England F. & C. Co., 66 Minn. 76, 68 N. W. 729, we stated the law thus:

"The word 'servant,' as used in this connection, is applicable to any relation in which, with reference to the matter out of which the alleged wrong has sprung, the person sought to be charged had the right under the contract of employment to control, in the given particular complained of, the action of the person doing the alleged wrong."

We think this is an accurate and complete statement of the general rule of law applicable to the subject.

If the defendant had, under its contract with Frankson, the right to control his action in the matter of setting up sample mills, then it is liable for his negligence. Under the evidence this was a question for the jury. It is true that its submission to them was not accompanied by such instructions as they ought to have received in order to decide it intelligently; but the defendant is not in position to complain of this, for it failed to ask for any more specific instructions on the subject.

2. The only remaining question is whether the damages awarded are excessive. The boy, one of eight children, was between eight and nine years of age. Aside from doing such chores about the house as he was bidden by his parents, the only work he had ever engaged in was selling newspapers on the village streets. His father was a butcher, whose occupation was to peddle through the country the flesh of animals which he bought and slaughtered. The injury to the boy consisted of the mangling of the ends of the ring and middle fingers of the left hand so as to require their amputation,—the one at the first joint, and the other just below the first joint. This was successfully done at one operation, and the fingers healed satisfactorily. Of course, this was necessarily accompanied by considerable pain; and there is some evidence to the effect that the ends of the fingers may always be somewhat more sensitive to heat and cold than if not amputated. There was, also, the opinion of a physician that the muscles supplying those fingers will not develop as fully as they would if the whole fingers were there. It is also true that

the amputation of the ends of these fingers constitutes something of a disfigurement of the person.

We have no desire to belittle the right which every one, even in the humblest walks of life, has to the possession of all his faculties, both mental and physical, unimpaired. But we are compelled to the conclusion that, in any view of the case, the damages awarded to the boy are excessive. There are certain professions, such as that of instrumental music, where the loss of the ends of two fingers, even on the left hand, would be quite serious; but it is self-evident, without the aid of evidence, that in all the ordinary occupations of life the injury to the boy will be almost inappreciable. We have often had occasion to say that the question is not for what sum of money would a person submit to such an injury, but what sum of money will compensate for it as far as money can compensate at all; and, where a person asks for pecuniary compensation, he cannot complain if the loss is estimated on a strictly pecuniary basis. If the boy is entitled, on this basis, to $1,800 for the loss of the ends of two fingers on the left hand, what would he have been entitled to, in the same ratio, for the loss of a leg or arm? It is evident that it would amount to a sum far beyond what any court would approve as within reason.

On the trial, near the close of the evidence, the plaintiff's counsel very adroitly dismissed the action as to Frankson and Conklin, the persons who, if any one, were actually guilty of negligence, giving as a reason (presumably in the presence of the jury) that they had established a cause of action against a Chicago corporation which was perfectly able to respond in damages. Reversible error can hardly be predicated on this, but the object is apparent; and it may, in part at least, account for the size of the verdict.

We are of opinion that the verdict in favor of the father is very liberal, but not so large that we would feel justified in holding it excessive, especially in view of the evidence as to the value of the surgeon's services for performing the amputation.

Ordered, therefore, that, in the action of Connor Gahagan, the order appealed from is affirmed, but that, in the action by Cornelius Gahagan, the order appealed from be reversed, unless the plaintiff, within 15 days after filing the remittitur in the district court, files his consent to a reduction of the verdict to $1,200, with interest from

the date of trial, in which case the order appealed from will be affirmed, and judgment for the plaintiff entered for the amount of the verdict as thus reduced.