*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0149**

Tina Marie Lund, as conservator of the Honorable Fred Karasov,
Appellant,

vs.

Calhoun Orange, Inc. d/b/a Orange Theory Fitness Minneapolis-Uptown,
Respondent,

Ultimate Fitness Group LLC, d/b/a Orangetheory Fitness,
Respondent.

**Filed December 4, 2023**
**Affirmed**
**Schmidt, Judge**
**Concurring in part and dissenting in part, Cleary, Judge**

Hennepin County District Court
File No. 27-CV-20-12141

Colin F. Peterson, Brandon Thompson, Kathleen Flynn Peterson, Rachel L. Barrett, Ciresi
Conlin LLP, Minneapolis, Minnesota (for appellant)

Julia J. Nierengarten, Michael D. Hutchens, Meagher & Geer, P.L.L.P., Minneapolis,
Minnesota (for respondent Calhoun Orange, Inc.)

Theodore J. Waldeck, Jason M. Stoffel, Waldeck & Woodrow, P.A., Minneapolis,
Minnesota (for respondent Ultimate Fitness Group LLC)

Considered and decided by Reyes, Presiding Judge; Schmidt, Judge; and

Cleary, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

**SCHMIDT**, Judge

Fred Karasov (Karasov) suffered a cardiac arrest during an exercise class and sustained a permanent brain injury. Appellant Tina Lund (Lund), Karasov's wife and conservator, brought various claims of negligence against respondents Calhoun Orange, Inc. d/b/a Orange Theory Fitness Minneapolis-Uptown (Calhoun Orange) and Ultimate Fitness Group LLC, d/b/a Orangetheory Fitness (Ultimate Fitness). Lund challenges the district court's (1) summary-judgment dismissal based on an exculpatory clause of her claims for negligence, medical negligence, and negligent undertaking against Calhoun Orange; (2) summary-judgment dismissal of her claims against Ultimate Fitness; and (3) denial of her motion for a new trial based on Calhoun Orange's alleged misstatements of the law at trial. We affirm.

## FACTS

*Ultimate Fitness and Calhoun Orange*

Ultimate Fitness is the parent company of Calhoun Orange and the franchisor of various Orangetheory Fitness studios across the United States. Calhoun Orange is a fitness studio operating under the name of Orange Theory Fitness. The franchise agreement between Ultimate Fitness and Calhoun Orange grants Ultimate Fitness control over several aspects of Calhoun Orange's operations, including the location of the studio, the sale of Orangetheory products, advertising, and marketing.

Ultimate Fitness also provided Calhoun Orange with a business policies guide. In the "Health & Safety" portion of the guide, Ultimate Fitness requires every franchisee to

2

have an automated external defibrillator (AED), a fire extinguisher, and a first-aid kit on the premises. Ultimate Fitness also requires that at least one person at the studio be trained in cardiopulmonary resuscitation (CPR) and how to properly administer an AED.

Calhoun Orange's manager drafted its emergency protocol and noted that "a lot of the language from that [protocol] is pulled from Orangetheory Fitness training, from the franchisor[.]" The emergency protocol requires Calhoun Orange employees to fill out an "incident/injury report." The document also lists several "Emergency Response Scenarios," which require the staff to "call 911 immediately," "start CPR immediately," and "have another staff member get the AED, bring [it] to the client and open the case."

*Karasov joins Calhoun Orange and suffers a permanent injury*

When Karasov joined Calhoun Orange, he signed an intake form:

> I (the "Client") voluntarily desire to participate in physical exercise training classes conducted on behalf of Orangetheory Fitness Uptown 2640 Hennepin Avenue, Minneapolis, MN. 55408 and understand [sic] agree to the following[:]
>
> . . . .
>
> 4. Client has been informed that any fitness program includes possible risks and all exercises shall be undertaken at Client's sole risk and discretion. Client assumes full responsibility for any and all damages, injuries or losses that may be sustained or incur, if any, while participating in any studio exercise program or physical activity. Client hereby waives all claims against the Studio, the Facility, the Studio instructors, officers, directors, employees or agents of either and/or any successor assigns or and all claims, demands, injuries, damages, actions or causes of action, whatsoever to my person or property arising out of or connected to the services, facilities, exercise classes, or the facility where same is located (including the Studio and/or the Facility, as

3

applicable).  Client hereby agrees to indemnify[,] defend, hold harmless, release and discharge the Studio and Facility from all claims, demands, injuries, damage actions [sic] causes of action and from all acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and assigns, whatsoever, for any damages, injuries or losses that may be sustained by the Client arising from or in connection with the activities that Client voluntarily participates, including without limitation, attorney's fees, costs, and expenses of any litigation, arbitration or other proceeding.

On September 7, 2019, Karasov attended a workout class at Calhoun Orange and collapsed approximately 60 minutes into the 90-minute class.  A class participant noticed the collapse and alerted M.B., the Calhoun Orange trainer.  M.B. was certified and trained in CPR and how to properly administer an AED.  M.B. yelled "[s]omebody grab the AED and someone call 911."  Another Calhoun Orange employee brought the AED into the workout classroom, and someone called 911.

After Karasov collapsed, two class participants—a nurse practitioner and a registered nurse—began performing CPR and pulse checks.  The Calhoun Orange employee placed the AED on the ground near Karasov but did not inform the nurses that the AED had arrived.  The AED was not used by a Calhoun Orange employee or the nurses.

When the paramedics arrived approximately 15 minutes later, they took over resuscitation efforts.  The paramedics applied the AED and, after one shock, resuscitated Karasov.  The paramedics transferred Karasov to the Hennepin County Medical Center for further care.  By that time, Karasov had suffered a permanent brain injury.  The injury requires lifelong medical and rehabilitative home care, home care, and equipment.

*Lawsuit and summary judgment orders*

Following the injury, Lund sued Calhoun Orange, alleging (1) negligence, (2) willful and wanton negligence, (3) negligent undertaking, (4) medical negligence, and (5) deceptive-trade practices.[1] The district court later allowed Lund to amend the complaint to add Ultimate Fitness. Lund alleged Ultimate Fitness, as the franchisor, should be vicariously liable for the actions of Calhoun Orange and its employees.

Calhoun Orange moved for summary judgment, arguing the exculpatory clause in the intake form barred Lund's claims. The district court granted summary judgment as to Lund's claims for negligence, negligent undertaking, and medical negligence, but denied summary judgment as to Lund's willful and wanton negligence claim.

Ultimate Fitness moved for summary judgment on Lund's vicarious-liability claims under the theories of apparent authority, respondeat superior, and joint enterprise. The district court granted the entire motion and dismissed Ultimate Fitness from the lawsuit.

*Trial*

Lund proceeded to trial on her remaining claim for willful and wanton negligence against Calhoun Orange. During the opening statement, Calhoun Orange's counsel told the jury, "By the way[,] this is not a negligence claim. The claim in this case is willful and wanton negligence[,] which is a much higher burden on the plaintiffs . . . ." Lund objected and requested a curative instruction regarding the definition of willful and wanton negligence. The district court reserved ruling until the following day. After discussing the

---

[1] Lund elected to forgo her deceptive trade practices claim at trial.

issue with the attorneys at length, the district court noted that both attorneys had used specific legal terms in their opening statements. The district court then instructed the jury to disregard each party's comments on the legal standards that apply to the case and that the court would provide instructions on the law that applies to the case.

During closing arguments, Calhoun Orange's counsel stated: "[B]ut if you think of the normal definitions of willful and wanton, you know, conjures up intentional, deliberate, indifference, don't care. Did you see any of that through [M.B.'s] testimony? Absolutely not." Lund made an objection, which the district court overruled.

Following closing arguments, the district court instructed the jury, "To the extent you believe the attorney's discussions of the legal standards differed from the instructions I gave you, you should disregard the attorney['s] comments and follow my instructions." After deliberation, the jury returned a verdict for Calhoun Orange.

Based on Calhoun Orange's alleged misstatements of the law, Lund moved for a new trial, arguing counsel's remarks in opening statements and closing argument constituted misconduct. The district court denied Lund's motion, determining that the court's repeated instructions to the jury cured any prejudice.

After the posttrial motion hearing, Lund filed a letter with the district court arguing that the recent decision in *Justice v. Marvel*, 979 N.W.2d 894, 902 (Minn. 2022), is relevant to the new-trial motion. In denying the motion, the district court disagreed that *Justice* had relevance to Lund's motion because the only basis for the new trial motion was counsel's "alleged misstatements of the law . . . in opening and closing statements."

This appeal follows.

**DECISION**

**I.     The district court properly granted summary judgment on Lund's negligence claims.**

Lund argues that the Minnesota Supreme Court's decision in *Justice* requires this court to reverse the district court's summary-judgment order on her negligence claims. We review a grant of summary judgment de novo. *Franklin v. Evans*, 992 N.W.2d 379, 384 (Minn. 2023). In doing so, we determine whether the district court correctly applied the law and whether any genuine issues of material fact preclude summary judgment. *Id.*

The law disfavors exculpatory and indemnification clauses. *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982). Clauses that exonerate a party from liability are strictly construed against the benefitted party. *Id.* An exculpatory clause that purports to release a party from intentional, willful, or wanton acts or is ambiguous in scope will not be enforced. *Id.*

In granting summary judgment, the district court relied on this court's decision in *Justice v. Marvel*, in which we held the exculpatory clause's purported release of "any and all claims" was overly broad. 965 N.W.2d 335, 347-48 (Minn. App. 2021), *rev'd*, 979 N.W.2d 894 (Minn. 2022). We held, however, that the clause was enforceable to the extent the plaintiff asserted a claim of ordinary negligence but unenforceable against claims of "greater-than-ordinary negligence." *Id.*

In reversing, the Minnesota Supreme Court clarified that "[t]o withstand strict construction . . . an exculpatory clause 'must use specific, express language that clearly and unequivocally states the contracting parties' intent,' regardless of whether the

7

provision 'is so broad that it necessarily includes the [released party's] own negligence.'" *Justice*, 979 N.W.2d at 901-02 (quoting *Dewitt v. London Rd. Rental Ctr., Inc.*, 910 N.W.2d 412, 417 (Minn. 2018) (internal quotations omitted)). The supreme court held that the waiver at issue did not "specifically provide that it released Marvel from liability for its own negligent acts." *Id.* at 902.

In ruling on Calhoun Orange's summary judgment motion, the district court did not have the benefit of the Minnesota Supreme Court's decision. The district court—relying on this court's decision upholding a waiver—dismissed Lund's negligence claims based upon the following clause:

> 4. . . . . Client hereby waives all claims against the Studio, the Facility, the Studio instructors, officers, directors, employees or agents of either and/or any successor assigns or and all claims, demands, injuries, damages, actions or causes of action, whatsoever to my person or property arising out of or connected to the services, facilities, exercise classes, or the facility where same is located (including the Studio and/or the Facility, as applicable).

We agree with Lund that, after the Minnesota Supreme Court's decision in *Justice*, the above language cannot release Calhoun Orange from liability for its own negligence. This clause, strictly construed, fails to mention Calhoun Orange's own negligence and, instead, attempts to release Calhoun Orange from "all claims." While the language could technically encompass claims for negligence, it fails to specifically and clearly state the parties' intent to release Calhoun Orange from liability for its own negligence as the supreme court required in *Justice*. *See* 979 N.W.2d at 901-03.

8

Although the sentence within paragraph 4 that the district court relied upon to grant summary judgment is unenforceable to release Calhoun Orange from its own negligence,[2] we "may affirm a grant of summary judgment if it can be sustained on any grounds." *Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 163 (Minn. 2012); *see also Winkler v. Magnuson*, 539 N.W.2d 821, 827 (Minn. App. 1995) (stating a district court's summary-judgment order may be affirmed if the decision is correct on other grounds). Paragraph 4 of the intake form, when read in its entirety, states:

> Client has been informed that any fitness program includes possible risks and all exercises shall be undertaken at Client's sole risk and discretion. Client assumes full responsibility for any and all damages, injuries or losses that may be sustained or incur, if any, while participating in any studio exercise program or physical activity. Client hereby waives all claims against the Studio, the Facility, the Studio instructors, officers, directors, employees or agents of either and/or any successor assigns or and all claims, demands, injuries, damages, actions or causes of action, whatsoever to my person or property arising out of or connected to the services, facilities, exercise classes, or the facility where same is located (including the Studio and/or the Facility, as applicable). Client hereby agrees to indemnify [sic] defend, hold harmless, release and discharge the Studio and Facility from all claims, demands, injuries, damage actions [sic] causes of action and from *all acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and*

[2] At the summary judgment stage, the parties only focused on one sentence within paragraph 4 of the intake form. On appeal, the parties dispute the effect of the entire language of paragraph 4. Although we could remand to the district court to consider the parties' developing arguments in the first instance, we choose to address the purely legal issue now rather than remand to the district court and further prolong this litigation. *See Harms v. Indep. Sch. Dist. No. 300*, 450 N.W.2d 571, 577 (Minn. 1990) ("An appellate court may decide an issue not determined by a trial court where that question is decisive of the entire controversy and where there is no possible advantage or disadvantage to either party in not having a prior ruling on the question.").

9

> *assigns*, whatsoever, for any damages, injuries or losses that may be sustained by the Client arising from or in connection with the activities that Client voluntarily participates, including without limitation, attorney's fees, costs, and expenses of any litigation, arbitration or other proceeding.

(Emphasis added.)

The parties disagree as to whether the emphasized language acts as an indemnity or an exculpatory clause. But the clause's characterization does not change our analysis because both indemnity and exculpatory clauses are strictly construed. *See Schlobohm*, 326 N.W.2d at 923 (holding that exculpatory clauses are strictly construed against the benefited party); *Dewitt*, 910 N.W.2d at 416 ("[W]e strictly construe . . . indemnity clauses."). We also note that, even if the clause is definitionally an indemnity clause, the result would be the same. *See Justice*, 979 N.W.2d at 901 ("an indemnification clause shifts liability 'back to the injured party, thus producing the same result as an exculpatory provision'") (quoting 57A Am. Jur. 2d *Negligence* § 43 (2022)). We conclude that the emphasized language, strictly construed, meets the requirements from the supreme court's decision in *Justice*—the waiver "specifically provide[s] that it released [Calhoun Orange] from liability for its own negligent acts." 979 N.W.2d at 902.

Notably, the Minnesota Supreme Court distinguished the broad waiver that did not release the party's own negligence in *Justice* with waivers in other cases that had specific language that released the party from its own negligence. *See* 979 N.W.2d at 902 (citing *Schlobohm*, 326 N.W.2d at 922 and *Anderson v. McOskar Enters.*, 712 N.W.2d 796, 799 (Minn. App. 2006)). In *Schlobohm*, the supreme court enforced strikingly similar waiver

language as in Calhoun Orange's intake form. 326 N.W.2d at 922. The relevant portion of the waiver in *Schlobohm* read:

> member does hereby expressly forever release and discharge the said Spa Petite from all such claims, demands, injuries, damages, actions or causes of action, and from *all acts of active or passive negligence* on the part of such company, corporation, club, its servants, agents, or employees.

*Id.* at 922 (emphasis added). The supreme court upheld the exculpatory clause as exonerating Spa Petite from negligence. *Id.* at 926.

Paragraph 4 in Calhoun Orange's client intake form includes the exact same language as *Schlobohm*, namely: "all acts of active or passive negligence[.]" Since *Schlobohm* remains good law,[3] we conclude that paragraph 4, as a whole, withstands strict construction as it "clearly and unequivocally" states the parties' intent to release Calhoun Orange from its own acts of negligence. *See Justice*, 979 N.W.2d at 902. Because the clause is enforceable, we affirm—though on different grounds—the district court's order granting summary judgment as to Lund's negligence claims against Calhoun Orange.

## II. The district court properly granted summary judgment to Ultimate Fitness.

Lund argues that the district court erred in granting summary judgment for Ultimate Fitness on her claims for direct and vicarious liability based on the doctrines of apparent authority, respondeat superior, and joint enterprise. We review the grant of summary judgment de novo to determine whether there are genuine issues of material fact and

---

[3] Because the supreme court did not overrule *Schlobohm* and, instead, distinguished the waiver in that case from the one in *Justice*, we decline to address the parties' arguments regarding whether the supreme court's decision in *Justice* applies retroactively or prospectively.

whether the district court erred in its application of the law. *Franklin*, 992 N.W.2d at 384. We view the evidence in the light most favorable to the nonmoving party. *Id.*

## A. Apparent authority

Lund argues that the district court erred in granting summary judgment for Ultimate Fitness on Lund's negligence claims based upon apparent authority, contending the district court imposed a standard of affirmative reliance. Under the doctrine of apparent authority, a principal is vicariously liable for the actions of the agent when (1) the principal either "held the agent out as having authority or knowingly permitted the agent to act on its behalf," and (2) the plaintiff relied upon the apparent authority. *Popovich v. Allina Health Sys.*, 946 N.W.2d 885, 895 (Minn. 2020) (quotations omitted).

The sole dispute before this court is whether knowledge alone satisfies the reliance prong. The supreme court in *Popovich* stated that "reliance" means "the plaintiff was aware of [the] representations of authority by the principal." *Id.* Lund contends the court's language means that knowledge alone satisfies the reliance prong. We disagree.

In *Popovich*, a medical-malpractice action, the supreme court addressed the application of apparent authority to hospitals and their independently contracted-for doctors. *Id.* at 890. Read in isolation, the sentence from *Popovich* seemingly equates knowledge with reliance. But the supreme court's full opinion holds that something more than mere knowledge is required. The supreme court held:

> "[R]eliance" focuses on the beliefs of patients and considers whether the patient looked to the hospital, rather than to a particular doctor, to provide care. Specifically, the fact-finder should determine if the plaintiff relied on the hospital to select the physician and other medical professionals to provide the

12

necessary services. This reliance standard reflects the reality that most people who go to the emergency room do not know which medical professionals will treat them once they arrive. Instead, they rely on the hospital to select the professionals for them.

*Id.* at 898 (footnotes omitted). *Popovich* does not limit the analysis of reliance to the plaintiff's knowledge. *Id.* Instead, the supreme court instructed fact-finders to determine whether a plaintiff relied on the hospital to select a physician and other medical professionals to provide care. *Id.*

A review of pre-*Popovich* Minnesota caselaw confirms that knowledge alone cannot satisfy the reliance prong. *See, e.g.*, *Bloomingdale v. Cushman*, 159 N.W. 1078, 1080 (Minn. 1916) ("[O]nly those who have acted in reliance upon the apparent authority of the agent are entitled to recover."); *Cauger v. Gray Motor Co.*, 217 N.W. 347, 348 (Minn. 1928) ("The doctrine of apparent authority can be invoked only by those who had knowledge that the agent had been permitted to exercise such authority and who act in reliance thereon."); *Karon v. Kellogg*, 261 N.W. 861, 862 (Minn. 1935) ("In the absence of knowledge on the plaintiffs' part . . . [t]hey could not have relied on the facts unknown to them."); *Truck Crane Serv. Co. v. Barr-Nelson, Inc.*, 329 N.W.2d 824, 827 (Minn. 1983) ("[P]laintiff failed to establish any awareness of *or reliance on* it at the time the agreement was reached.") (emphasis added). Each case defines knowledge as a prerequisite to reliance rather than defining the terms as interchangeable.[4] The district court correctly

---

[4] This court has also applied *Popivich* as requiring more than mere knowledge. *See, e.g.*, *Rock v. Abdullah*, No. A21-1716, 2022 WL 2794053, at *2 (Minn. App. July 18, 2022) ("The supreme court noted that its newly adopted standard 'mirrors' the traditional

13

determined that "apparent authority reliance requires more than simply whether or not plaintiff was aware of the representations of authority by the principal."

Lund points to no evidence, and our review of the record finds none, reflecting that Karasov relied on Ultimate Fitness's representations of authority when choosing Calhoun Orange as his fitness studio. Because knowledge alone cannot satisfy the reliance element, the district court properly granted summary judgment on Lund's apparent authority claim.

**B. Respondeat superior**

Lund next challenges the district court's grant of summary judgment for Ultimate Fitness on Lund's claims under the doctrine of respondeat superior. Courts impose vicarious liability when either a master-servant or principal-agent relationship exists between a tortfeasor and a third party. *Nadeau v. Melin*, 110 N.W.2d 29, 34 (Minn. 1961). "A principle-agent relationship results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Urb. ex rel. Urb. v. Am. Legion Post 184*, 695 N.W.2d 153, 160 (Minn. App. 2005) (quotation omitted), *aff'd*, 723 N.W.2d 1 (Minn. 2006). The doctrine requires that the principle or master had "the right to control" the agent or servant. *Id.*

The only issue under Lund's respondeat superior claim is whether Ultimate Fitness had the right to control Calhoun Orange. "The determinative right of control is not merely over what is to be done, but primarily over how it is to be done." *Frankie v. Twedt*, 47 N.W.2d 482, 487 (Minn. 1951). Put differently, the supreme court described the control

---

elements of apparent authority: holding out and reliance.") (citation omitted), *rev. denied* (Minn. Oct. 18, 2022). *Rock* is a nonprecedential opinion, cited for its persuasive value.

element as "the right to control the action of the person doing the alleged wrong in respect to the manner in which the work shall be done." *Gahagan v. Aerometer Co.*, 69 N.W. 914, 915 (Minn. 1897).

Lund argues that the control prong is satisfied because Ultimate Fitness required Calhoun Orange to have an AED, a first aid kit, and a fire extinguisher on the premises. But when determining control, Ultimate Fitness must have had control over "*how*" Calhoun Orange is to perform during medical emergencies. *Frankie*, 47 N.W.2d at 487 (emphasis added). While Ultimate Fitness mandated certain equipment be on Calhoun Orange's premises, it did not mandate how Calhoun Orange must respond to medical emergencies or even whether Calhoun Orange needed to use the emergency equipment.

Lund points to Calhoun Orange's emergency-response document and argues that the right-to-control element is satisfied because it borrowed language directly from Ultimate Fitness's training documents. But Calhoun Orange independently created the document and voluntarily borrowed language from Ultimate Fitness's training documents. The record contains no evidence that Ultimate Fitness had control over whether Calhoun Orange decided to borrow its language.

Lund also contends that Ultimate Fitness's right to control is established through the required marketing plan, vendors for retail items, hours of operation, and studio location. Although these facts support the idea that Ultimate Fitness exercised some control over Calhoun Orange's day-to-day operations, the right to control must be tied to the asserted claim. *See Gahagan*, 69 N.W. at 255 (holding that principal is liable for agent's negligence only if principal had right to control actions that led to harm). Ultimate

15

Fitness's right to control some of Calhoun Orange's marketing and business operations have no connection to Calhoun Orange's emergency-response protocols.

Viewing the evidence in a light most favorable to Lund, there are no genuine issues of material fact as to the element of control. The record lacks evidence to show that Ultimate Fitness had a right to control Calhoun Orange's emergency-response protocols. We conclude the district court properly granted summary judgment to Ultimate Fitness on Lund's claim under the doctrine of respondeat superior.

### C. Joint enterprise

Lund argues that the district court imposed a heightened standard of control when it granted summary judgment to Ultimate Fitness on Lund's claims under the doctrine of joint enterprise. Joint enterprise liability exists when there is "(1) a mutual understanding for a common purpose, and (2) a right to a voice in the direction and control of the means used to carry out the common purpose." *Delgado v. Lohmar*, 289 N.W.2d 479, 482 (Minn. 1979). Each member of the enterprise is an agent of the other members. *Ruth v. Hutchinson*, 296 N.W.2d 136, 141 (Minn. 1941).

The sole dispute on appeal is whether Ultimate Fitness had an equal right to control the emergency-response protocols. "The right to control means that all involved in the undertaking must have a joint or mutual right to direct the agency used to carry out the common purpose." *Pierson v. Edstrom*, 174 N.W.2d 712, 714 (Minn. 1970). This prong does not require that "the right to control actually be exercised." *Id.* Courts have often imposed joint enterprise liability to automobile cases and have required an equal right to control the means necessary to carry out the common purpose. *See, e.g.*, *Ruth*, 296 N.W.

16

at 141 ("The testimony is explicit that each one of them had an equal voice in the running of the trip."); *Feeser v. Emery*, 134 N.W.2d 23, 26 (Minn. 1965) (finding joint enterprise existed when both parties shared expenses, management, and control of road trip).

In granting summary judgment to Ultimate Fitness, the district court determined that Ultimate fitness "did not control how Calhoun Orange responded to emergencies[.]" Lund contends that the district court's language suggests that Ultimate Fitness needed to actually exercise control over Calhoun Orange. We disagree.

As noted above, the parties did not have an equal right to determine emergency-response protocols. Calhoun Orange did not have an equal say in whether to keep an AED on the premises. And Ultimate Fitness did not have the equal authority to draft emergency-response guidelines for Calhoun Orange. The record establishes that Ultimate Fitness did not have an equal or mutual right to control Calhoun Orange's emergency-response plan. Viewing the evidence in the light most favorable to Lund, we conclude there are no genuine issues of material fact as to whether the parties had an equal right of control, and the district court did not err in granting summary judgment on Lund's claims under joint enterprise.

### III. The district court did not abuse its discretion in denying Lund's new-trial motion.

Lund argues the district court abused its discretion in denying her motion for a new trial. Whether to grant a new trial because of attorney misconduct is "not governed by fixed rules, but instead rests wholly within the discretion of the trial court." *Johnson v. Washington Cnty.*, 518 N.W.2d 594, 600 (Minn. 1994). In deciding whether to

17

grant a new trial, the primary consideration is prejudice. *Wild v. Rarig*, 234 N.W.2d 775, 785 (Minn. 1975).

The district court did not abuse its discretion in denying Lund's motion for a new trial. Even if we assume that counsel for Calhoun Orange misstated the law, the district court twice told the jury—after opening statements and following closing arguments—to ignore any reference by the attorneys to the legal standard governing Lund's willful and wanton negligence claim and to instead follow the instructions provided by the court. The district court's jury instructions accurately reflected the legal standard, and we presume "juries follow the instructions they are given." *Frazier v. Burlington N. Santa Fe Corp.*, 811 N.W.2d 618, 630 (Minn. 2012). Because the jury instructions sufficiently cured any potential prejudice, the district court did not abuse its discretion in denying Lund's motion for a new trial.

**Affirmed.**

**CLEARY**, Judge (concurring in part, dissenting in part)

While I concur with the majority's opinion on parts II and III, I respectfully dissent from the majority's decision that respondent Calhoun Orange's second exculpatory clause is enforceable.

The majority concludes that although the first exculpatory clause analyzed by the district court is unenforceable under the supreme court's decision in *Justice v. Marvel*, 979 N.W.2d 894 (Minn. 2022), the second exculpatory clause is enforceable because it mentions "active or passive negligence." I disagree. The first and second exculpatory clauses, when read together, contradict one another and must be interpreted against Calhoun Orange.

Paragraph four of the intake form states:

> Client has been informed that any fitness program includes possible risks and all exercises shall be undertaken at Client's sole risk and discretion. Client assumes full responsibility for any and all damages, injuries or losses that may be sustained or incur, if any, while participating in any studio exercise program or physical activity. Client hereby waives all claims against the Studio, the Facility, the Studio instructors, officers, directors, employees or agents of either and/or any successor assigns or and all claims, demands, injuries, damages, actions or causes of action, whatsoever to my person or property arising out of or connected to the services, facilities, exercise classes, or the facility where same is located (including the Studio and/or the Facility, as applicable). Client hereby agrees to indemnify[,] defend, hold harmless, release and discharge the Studio and Facility from all claims, demands, injuries, damage actions[,] causes of action and from all acts of active or passive negligence on the part of the Studio, the Facility, the Studio instructors, their servants, agents, employees, and/or any successors and assigns, whatsoever, for any damages, injuries or losses that may be sustained by the Client arising from or in connection with the activities that Client voluntarily

C/D-1

> participates, including without limitation, attorney's fees, costs, and expenses of any litigation, arbitration or other proceeding.

The intake form contains two separate clauses with exculpatory language. The first clause attempts to release Calhoun Orange from liability for "all claims." I agree with the majority that this exculpatory clause is unenforceable under the supreme court's decision in *Justice v. Marvel*, 979 N.W.2d at 901-03 (requiring exculpatory clauses to use specific and clear language expressing the intent to discharge a party for its own negligent acts). I also agree with the majority that the second exculpatory clause on its own satisfies the supreme court's requirements by limiting itself to Calhoun Orange's "acts of active or passive negligence."

My divergence with the majority lies in the fact that the exculpatory clauses contradict one another. One clause seeks to discharge Calhoun Orange from "all claims," while the other limits the waiver to "acts of active or passive negligence." As a general rule, when two provisions of a contract conflict, "it is this court's duty to find harmony between them and to reconcile them if possible." *Nat'l City Bank v. Engler*, 777 N.W.2d 762, 765 (Minn. App. 2010) (citation omitted), *rev. denied* (Minn. Apr. 20, 2010); *see also* 17A C.J.S. *Contracts* § 324 (1999) ("Apparently conflicting provisions must be reconciled so as to give meaning to both, rather than nullifying any contractual provision, if reconciliation can be effected by any reasonable interpretation of the entire instrument."). But the supreme court in *Justice* explicitly dismissed this theory of construction when analyzing exculpatory clauses in favor of strict construction. 979 N.W.2d at 899 ("We have since turned away from the rule of fair construction in cases involving exculpatory clauses

in favor of strictly construing such clauses."). Strict construction requires the parties to "clearly and unequivocally express the contracting parties' intent." *Id.* at 899-900.

I fail to see how Calhoun Orange's intake form meets this stringent standard when the contract provides contradicting scopes of waiver. The contract cannot expressly state the parties' intent to release Calhoun Orange from its acts of negligence when it expressly provides otherwise in a separate clause. While no Minnesota court has had the chance to address this issue, other jurisdictions have agreed that when one of the contradicting clauses is an exculpatory clause, it takes no effect. *See, e.g.*, *Madrid v. Roth*, 10 P.3d 751, 755-56 (Idaho App. 2000) (determining that the exculpatory clause took no effect because it contradicted another part of the contract), *rev. denied* (Idaho Sept. 15, 2000); *Dynair Tech of Fla., Inc. v. Cayman Airways Ltd.*, 558 So. 3d 30, 32 (Fla. 3d DCA 1989) (holding that because one clause of the agreement limited the defendant's liability to its "sole negligence" while another clause limited the defendant's liability to "gross negligence or willful misconduct," the subject exculpatory clause took no effect).

In sum, I disagree with the majority's holding that the intake form's exculpatory clause is enforceable. While in a vacuum the second exculpatory clause meets strict construction, it directly contradicts the first exculpatory clause. The clauses read together fail to meet the strict construction's requirements, and the contract must be interpreted against Calhoun Orange. I would reverse the district court's grant of summary judgment based on the exculpatory clause, allowing Lund to proceed to trial on her claims for negligence, medical negligence, and negligent undertaking against Calhoun Orange.