*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-1662**
**A24-1821**
**A24-1822**
**A24-1823**
**A24-1824**

In re Defense and Indemnification of Matthew Severance
- Awaijane et al. v. Bittell et al.,

In re Defense and Indemnification of Kristopher Dauble,

In re Defense and Indemnification of Andrew Bittell,

In re Defense and Indemnification of Christopher Cushenbery,

In re Defense and Indemnification of Ronald Stenerson.

**Filed October 27, 2025**
**Affirmed; motion granted**
**Bentley, Judge**

City of Minneapolis

Francis J. Rondoni, Gary K. Luloff, Andrew C. Case, Chestnut Cambronne PA, Minneapolis, Minnesota (for relator Matthew Severance)

Joseph A. Kelly, Kevin M. Beck, Rebecca L. Duren, Kelly & Lemmons, P.A., St. Paul, Minnesota (for relators Kristopher Dauble, Andrew Bittell, Christopher Cushenbery, and Ronald Stenerson)

Kristyn Anderson, Minneapolis City Attorney, Munazza Humayun, Adam E. Szymanski, Assistant City Attorneys, Minneapolis, Minnesota (for respondent City of Minneapolis)

Considered and decided by Larson, Presiding Judge; Bentley, Judge; and Kirk, Judge.[*]

## NONPRECEDENTIAL OPINION

**BENTLEY**, Judge

In these consolidated certiorari appeals, relators Matthew Severance, Andrew Bittell, Christopher Cushenbery, Kristopher Dauble, and Ronald Stenerson challenge decisions by respondent City of Minneapolis denying their requests for defense and indemnification. Relators requested defense and indemnification in relation to a federal lawsuit alleging that relators, who were employed by the city as police officers, used unreasonable force while patrolling city streets during a citywide curfew imposed after the murder of George Floyd. The city denied relators' requests for defense and indemnification after determining that they were "guilty of malfeasance in office, willful neglect of duty, or bad faith." Minn. Stat. § 466.07, subd. 1(2) (2024).

On appeal, relators argue that the city exceeded its authority in denying relators' defense-and-indemnification requests, that the city's decisions violated relators' constitutional rights to due process and equal protection, and that the decisions are unsupported by substantial evidence and are arbitrary. Severance brought a motion to supplement the record for his appeal.

We construe the motion to supplement the record as a motion to complete the record, and we grant the motion. We reject relators' challenges to the city's decisions based on the

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

city exceeding its authority and violating relators' constitutional rights because they are foreclosed by our recent decision in *In re Defense & Indemnification of Brown*, ___ N.W.3d ___, 2025 WL 2901740 (Minn. App. Oct. 13, 2025), or they are otherwise unavailing. And we conclude that the city's decisions to deny relators defense and indemnification are supported by substantial evidence and are not arbitrary.

We therefore affirm.

**FACTS**

*Events Underlying the Federal Lawsuit*

The city denied relators' requests for defense and indemnification in relation to a federal lawsuit stemming from events that occurred on May 30, 2020. The following summary of those events is based on the administrative records for these appeals, which include body-worn camera footage from several officers as well as the amended complaint in the federal lawsuit.[1]

On May 29, 2020, in response to the unrest following George Floyd's murder four days earlier, the governor issued an emergency executive order imposing a two-day curfew for Minneapolis and St. Paul. The curfew prohibited "travel on any public street or in any public place" from 8 p.m. to 6 a.m. A willful violation of the curfew was a misdemeanor punishable "by a fine not to exceed $1,000 or by imprisonment for not more than 90 days."

---

[1] As we explain more fully in section II of the analysis, Severance brought a motion to supplement the record that the city transmitted in relation to his appeal. We construe that motion as a motion to complete the record and grant it. Our factual summary therefore includes facts based on materials that were the subject of Severance's motion.

"[M]embers of the news media" were exempt from the curfew. The curfew was in effect on the evening of May 30, 2020, when the following events took place.

Severance was acting as a supervisor for the Minneapolis Police Department (MPD) and was responsible for directing "strike teams," which were mobile units of officers being deployed around the city to enforce the curfew. Among the team leaders under his direction was Bittell, who was leading a chemical agent response team (CART)—CART 1281—that included Cushenbery and Dauble.[2] As the team leader, Bittell was responsible for "mak[ing] decisions for what might come up" in the field. CART 1281 was assigned to work with Strike Team 5, which included Stenerson.

Around 10:40 p.m., at the intersection of Lake Street and Hiawatha Avenue in Minneapolis, in the presence of multiple police officers, Severance gave the following instructions:

> So all's we're gonna do is take all of the strike teams and split 'em up. We're gonna kinda stay together a little bit, but we're gonna split up. Drive down Lake Street. You see a f--cking group, call it out. Okay, great. F--k 'em up. Gas 'em, f--k 'em up.

According to Bittell, Severance said at one point, "I want to f--k 'em up," which Bittell took to mean that the strike teams should use force to disperse any crowds they saw. These instructions were separate from what Severance on appeal characterizes as his "official directive." In the official directive, which was aired over the radio, Severance instructed strike teams to "get mobile," "split up," and "disrupt[] groups." Severance further

---

[2] A CART consists of officers who are specially trained and carry chemical munitions for riot control.

instructed, "Any large group[,] I want you to air their location and we're gonna disrupt this group."

After receiving these directions from Severance, Bittell told the officers in CART 1281, including Cushenbery and Dauble, "Alright, we're rolling down Lake Street. The first f--kers we see, we're just hammering 'em with 40s." Another officer replied, "Yes, sir!" To confirm, Bittell asked, "Is that a good copy?" When another officer asked what they were doing with the people on Lake Street, Bittell replied, "Shooting 'em with 40s." Bittell later conceded that he said, "something to the effect of, 'Everybody on Lake Street's going to get a 40.'"[3]

Afterward, CART 1281 headed down Lake Street in an unmarked van. Bittell rode in the front passenger seat, where he had "a better bird's-eye perspective of what was going on," could "point out" suspicious activity, and could "instruct" the other officers accordingly. Cushenbery and Dauble rode in the back of the van with its sliding passenger-side door open. As the van approached the intersection of Lake Street and 17th Avenue South, Bittell noticed individuals standing outside in a gas station parking lot and instructed the driving officer to drive toward the gas station.

As the van was pulling up to the parking lot, Bittell instructed the officers, "Let 'em have it boys, let 'em have it!" At least one 40mm shot was fired before Bittell finished

---

[3] "40s" refer to 40mm less-lethal munitions, which fire potentially lethal projectiles to "disperse people or meet threats by causing pain and fear in the target," according to Bittell's testimony in a criminal case stemming from another incident on May 30, 2020. A partial transcript of Bittell's testimony is included in the records for all but Stenerson's appeal and includes Bittell's concession described above.

5

giving these instructions, and the officers fired more shots from the van over the next few seconds. Only after multiple shots were fired did an officer yell at the individuals in the parking lot to "get outta here."

A few seconds later, as the van came to a stop, Bittell again instructed the officers, "Get 'em, get 'em, get 'em. Hit 'em, hit 'em." Bittell's body-worn camera footage shows multiple officers already at the scene as he exited the van and eventually approached the gas station. As the other CART 1281 officers headed toward the gas station, the individuals at the gas station can be heard on body-worn camera footage saying that the gas station's owner was with them and that they were "guarding the store." The CART 1281 officers instructed the individuals to go inside the gas station and returned to the van.

Around the same time that CART 1281 arrived at the gas station, Stenerson arrived with Strike Team 5 and received orders to "clear th[e] . . . lot out." Stenerson, who had a gas mask on, began walking around the gas station with a can of chemical irritant and a baton. At some point, Stenerson walked by a journalist who was lying face down on the ground holding up his press identification card. The journalist told Stenerson, "I am press," as Stenerson walked by. Stenerson sprayed the chemical irritant on the journalist's face. The journalist's recording device captured the journalist saying, "I was just sprayed in the face with pepper spray," as Stenerson walked away. Stenerson was later investigated by the city's Office of Police Conduct Review (OPCR) in connection with this incident. When providing his statement as part of the investigation, Stenerson said that he "maced everyone [he] encountered," including "a person that came up to [him]" with "his hands up." MPD

6

terminated his employment after a review panel concluded that Stenerson had "deliberately acted in an unprofessional manner during his duty" and violated MPD policies.

*The Federal Lawsuit and Requests for Defense and Indemnification*

In September 2023, six individuals who were present at the gas station during the May 30, 2020 events (the plaintiffs) sued relators and the city in federal court under 42 U.S.C. § 1983 (2018), asserting violations of their constitutional rights. The plaintiffs alleged that they suffered physical, mental, and emotional injuries from relators' use of force that evening, including Stenerson's use of chemical agents, Cushenbery's and Dauble's use of 40mm munitions, and Severance's and Bittell's reckless and indifferent instructions.

In October 2023, the city sent relators preliminary letters referencing the name and file number of the federal lawsuit and stating that the city had not yet accepted defense and indemnification of the claims. In accordance with its defense-and-indemnification policy, the city provided relators with "an opportunity to submit evidence and argument in support of any request for defense and indemnification" within 30 days. Attached to the letter was a copy of the city's defense-and-indemnification policy and procedures. The city's policy states:

> Pursuant to the terms of Minn. Stat. § 466.07, subject to the limitations in section 466.04, the City will defend and indemnify any of its officers and employees . . . for damages, including punitive damages, claimed or levied against the officer or employee, provided that the officer or employee: (1) was acting in the performance of the duties of the position; and (2) was not guilty of malfeasance in office, willful neglect of duty, or bad faith.

7

Adopted in 2020, the city's defense-and-indemnification procedures provide that the city will notify the affected employee that the matter is under consideration if the city does not immediately accept defense and indemnification. The employee then has at least 30 days to submit any relevant materials. Then, "no fewer than 7 days after the materials are submitted," "[t]he City Attorney or designee shall make a quasi-judicial determination as to whether the City will defend and indemnify the employee." That determination

> shall be made in writing and shall include: a description of the employee's notice and opportunity to submit evidence and argument in support of the request to defend; a statement of the documents and information considered; factual findings that support the determination; application of those factual findings to the prescribed legal standards according to applicable law and the City policy; and a binding decision regarding the request.

The employee is "provided with notice of the quasi-judicial determination and a copy of any written decision."

In December 2023, Bittel, Cushenbery, Dauble, and Stenerson each submitted a memorandum to the city requesting defense and indemnification, identifying the standard for indemnification under Minnesota Statutes section 466.07, subdivision 1 (2024), and providing analysis as to why they were entitled to indemnification under the statute. On April 15, 2024, Severance belatedly submitted a letter requesting defense and indemnification, asserting without any additional explanation that the city was required to grant his request because "the claims filed against [him] involve[d] allegations relating to the performance of his duties as an officer for the [MPD]," and he was "not guilty of any malfeasance while in office, willful neglect of duty or bad faith." None of the relators

8

included any evidence with their submissions or identified any materials that the city should consider.

In August and September 2024, the city issued its decisions denying relators' requests for defense and indemnification. The city determined that relators engaged in conduct that violated police department policies forbidding unreasonable force and were therefore not entitled to defense and indemnification because they were "guilty of malfeasance in office, willful neglect of duty, or bad faith." Minn. Stat. § 466.07, subd. 1.

Relators appeal.

**DECISION**

Under Minnesota Statutes section 466.07, subdivision 1, "[a] municipality is required to defend and indemnify its employee unless the municipality determines that the employee was not acting in the performance of the duties of the employee's position or was guilty of malfeasance in office, willful neglect of duty, or bad faith." *Anzures v. Ward*, 890 N.W.2d 127, 132 (Minn. App. 2017). "[A] quasi-judicial decision by a municipality determining eligibility for defense and indemnification under section 466.07 may . . . be appealed by writ of certiorari." *Reetz v. City of St. Paul*, 956 N.W.2d 238, 244 (Minn. 2021). And an appellate court reviews such a decision to determine "whether it is 'arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it.'" *Id.* (quoting *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn. 1992)).

Relators make several arguments in seeking reversal of the city's defense-and-indemnification decisions.[4] In the following sections, we address the arguments in two groups.

We first address relators' arguments that the city exceeded its authority and violated relators' constitutional rights in deciding to deny them defense and indemnification. In a recent precedential opinion, we addressed largely identical arguments raised by another police officer to whom the city denied defense and indemnification. *See Brown*, 2025 WL 2901740, at *4-11. Alexander Vladimir Brown sought defense and indemnification in relation to a lawsuit brought against him based on events that happened in August 2020. *Id.* at *2. The city denied Brown's request for defense and indemnification on the same ground that it denied relators' requests, determining that he had engaged in malfeasance, willful neglect of duty, and/or bad faith. *Id.* at *3. Although their defense-and-indemnification requests stem from different factual circumstances, Brown and the joint relators are represented by the same counsel, who raised the same legal and constitutional issues in both *Brown* and these appeals. Severance also raises many of the same arguments in his appeal. For reasons explained in section I below, we are persuaded that relators' assertions that the city exceeded its authority and violated their constitutional rights are foreclosed by *Brown* or are otherwise unavailing.

---

[4] In these consolidated appeals, Severance filed briefs individually; Bittell, Cushenbery, Dauble, and Stenerson filed briefs jointly. When necessary to distinguish their arguments, we refer to Severance by his surname and to Bittell, Cushenbery, Dauble, and Stenerson as "joint relators." We use "relators" to refer collectively to Severance and the joint relators.

We then address relators' arguments that the city's decisions to deny them defense and indemnification are unsupported by substantial evidence and are arbitrary. For reasons explained in section II below, these arguments do not persuade us to reverse.

**I**

Turning to the issues that are common to *Brown* and these appeals, we address in turn relators' arguments that the city exceeded its authority and that it violated relators' constitutional rights to procedural due process, substantive due process, and equal protection of the law.[5]

**A**

Relators make two arguments regarding the city's authority. The first is aimed at the city's decision to change its defense-and-indemnification procedures in 2020.[6] As we explained in *Brown*, challenges to the city's decision to adopt the new procedures fall outside the scope of our certiorari review of the city's decisions to deny relators' requests for defense and indemnification. *Id.* at *4-5. Our certiorari jurisdiction "includes the authority to review questions of law, including constitutional issues, arising from quasi-judicial decisions." *Id.* at *4. But it does not extend to challenges to the city's quasi-

---

[5] We note, as we did in *Brown*, that relators do "not argue that the analysis required under the United States and Minnesota Constitutions is different" with respect to the issues in these appeals. *Brown*, 2025 WL 2901740, at *7 n.5. In considering their constitutional arguments, "we therefore assume without deciding that the protections are the same under both constitutions." *Id.*

[6] Under the city's former procedures, employees seeking defense and indemnification could seek a hearing before an administrative-law judge. Under the current policy, the city attorney makes the defense-and-indemnification decision on written submissions.

11

legislative "decision to make policy and procedural changes to its process for determining whether to accept requests for defense and indemnification." *Id.* at *5. We therefore decline, as we did in *Brown*, to address relators' arguments regarding the city's decision to change its defense and indemnification policy in 2020. *See id.*[7]

Relators' second argument stems from their assertion that the city's defense-and-indemnification policy is preempted by Minnesota Statutes section 466.07, subdivision 1. Relators focus on language in the statute providing that a "municipality *shall* defend and indemnify" its employees. Minn. Stat. § 466.07, subd. 1 (emphasis added). They also assert that the statute's silence on the decision-maker and procedure for deciding a defense-and-indemnification request precluded the city from acting, as Severance puts it, as the "designated decision-maker for determining whether an officer is 'guilty of malfeasance in office, willful neglect of duty, or bad faith.'" And relators assert that the city improperly assigned them a burden of proof in contravention of the statute. We rejected these arguments in *Brown*. 2025 WL 2901740, at *6. We reasoned that the plain and unambiguous language of section 466.07, subdivision 1, does not preclude the city from deciding a request for defense and indemnification or require the city to provide a particular procedure for deciding the request. And we relied on prior precedential decisions that recognized municipal authority to determine such requests. *Id.* (citing *Reetz*, 956 N.W.2d at 244; *Anzures*, 890 N.W.2d at 132). We further noted that the statute does not assign a

---

[7] To be clear, challenges to the city's *current* procedures, as applied to relators, are within the scope of our review, and we address those challenges throughout this opinion.

12

burden of proof, and we rejected Brown's assertion that the city's procedure places the burden of proof on the requesting officer. *Id.* at *6 & n.4. For the same reasons, we reject relators' preemption arguments here.[8]

**B**

Relators assert that the city violated their procedural-due-process rights. The joint relators also assert substantive-due-process violations. We considered the same procedural- and substantive-due-process challenges in *Brown* and concluded that, on the facts of that case, the city's process did not violate Brown's due-process rights. *Id.* at *7-10. Applying the reasoning of *Brown* to the facts of these cases, we similarly conclude that the city did not violate relators' due process rights.

**1**

Determining whether there has been a violation of procedural-due-process rights involves a two-step process. *Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012). The court determines, first, whether the government has deprived a person of a protected life, liberty, or property interest. *Id.* If not, there can be no due-process violation. *Id.* If so, the court determines, second, "whether the procedures followed by the government were constitutionally sufficient." *Id.* (quotation omitted). This second determination involves "weigh[ing] the *Mathews* factors to determine what type of process

---

[8] Relators also seem to assert that the city's defense-and-indemnification policy is contrary to section 466.07, subdivision 1, because the policy replaces the statutory term "shall" with "will." But we understand the policy language to reflect the city's recognition of its duty under subdivision 1; in other words, the city is saying that it "will" do what the legislature has directed that the city "shall" do.

is constitutionally due to a person deprived of such an interest." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The *Mathews* balancing test requires consideration of the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

In *Brown*, we assumed without deciding that Brown had a protected property interest in defense and indemnification under section 466.07, subdivision 1, and we applied the *Mathews* balancing test. *Brown*, 2025 WL 2901740, at *7-9; *see also Mathews*, 424 U.S. at 335. Under the first *Mathews* factor, we determined that Brown had an interest in receiving defense and indemnification but reasoned that the interest was less significant than a person's interests in their livelihood or employment—two private interests which courts have assigned significant weight. *Brown*, 2025 WL 2901740, at *7-8. We concluded that the first *Mathews* factor "weigh[ed] in Brown's favor" but did "not weigh heavily because the city's decision to deny his defense-and-indemnification request neither deprive[d] him of his livelihood nor restrict[ed] his employment" as a police officer. *Id.* at *8.

We next considered the second *Mathews* factor, which looks at the risk of "'erroneous deprivation of a protected interest' and the likely benefit of 'additional safeguards.'" *Id.* (quoting *Sawh*, 823 N.W.2d at 634). As to this factor, we were mindful

14

of Brown's position that the city did not provide him with meaningful notice or a reasonable opportunity to be heard. *Id.* We acknowledged that the city did not disclose what evidence it intended to rely on in deciding Brown's defense-and-indemnification request, identify which specific police department policies it believed he had violated or which specific exception or exceptions under subdivision 1 of Minnesota Statutes section 466.07 it believed applied, or provide him an opportunity to present live testimony. *Id.* We nevertheless concluded that the second *Mathews* factor weighed in favor of the city. *Id.* We noted that the city's initial letter to Brown referenced the underlying lawsuit, notified him that it had not accepted defense and indemnification, and enclosed a copy of its defense-and-indemnification policy and procedures, "which cite Minnesota Statutes section 466.07 and set forth the exceptions for malfeasance in office, willful neglect of duty, and bad faith that are provided in subdivision 1." *Id.* The second *Mathews* factor weighed in favor of the city, we determined, because "the city at least provided Brown reasonable notice and a reasonable opportunity to be heard." *Id.* at *9. And we emphasized that Brown had submitted written argument to the city in support of his request for defense and indemnification and that his "written and oral appellate arguments have neither articulated the probable value of substitute procedural safeguards nor pointed to any additional evidence or argument that he was precluded from presenting because of the procedures that the city used." *Id.* We therefore concluded that, "whatever risk of erroneous deprivation" there was, it was "mitigated by the lack of any probable value of additional or substitute procedural safeguards." *Id.*

15

We next concluded that the third *Mathews* factor favored the city. *Id.* We recognized the city's interests in ensuring the appropriate use of public funds and avoiding the expense of providing additional process. *Id.* Having addressed each of the three *Mathews* factors, we weighed them to conclude that the process afforded by the city was constitutionally sufficient. *Id.*

Turning to the circumstances of these cases, we assume without deciding that section 466.07, subdivision 1, creates a protected property interest, as we did in *Brown*, and we thus analyze the *Mathews* factors.

On the first *Mathews* factor, we recognize relators' interest in defense and indemnification but contrast it with interests that have been recognized as weightier, as we did in *Brown*. We conclude that the first *Mathews* factor favors relators but not to the same degree as if it had precluded them from working as police officers. *Id.* at *8.

On the second *Mathews* factor, we acknowledge, as we did in *Brown*, the very limited nature of the city's process. But we consider that process in the context of the arguments presented by relators. The joint relators do not reference, much less purport to apply, the *Mathews* factors. Nor do they state what process they believe is constitutionally required. Instead, they point to the process that the city employed under its former defense-and-indemnification policy—a hearing before an ALJ—and assert that the "City abandoned this constitutionally valid process." That assertion—that the process provided under the *former* policy was "constitutionally valid"—does not address whether the process provided under the *current* policy is constitutionally inadequate. For his part, Severance argues that "the City's quasi-judicial procedure provokes an extraordinary risk of erroneous

16

deprivation," but he does not explain what information or argument he was precluded from submitting because of the city's procedure. *See Staeheli v. City of St. Paul*, 732 N.W.2d 298, 305 (Minn. App. 2007) (noting the relator failed to show "that he was unable to present material evidence or that the board was unable to thoroughly consider an important issue").

Given the arguments presented by relators in this case, there is no demonstrable difference in the process provided to relators and Brown. First, as in *Brown*, the city's initial letters to relators referenced the underlying litigation and attached the city's defense-and-indemnification policy and procedures. Second, the complaint in the litigation set forth in detail the conduct that the relators are alleged to have engaged in on May 30, 2020. Third, as we have explained, the relators fail to identify any evidence that they were precluded from submitting or any argument that they were precluded from making because of the procedure the city used. And fourth, we note that the events underlying the lawsuit are depicted in footage from the body-worn cameras of several officers, and the city's decision did not turn on credibility determinations. Thus, in light of our recent decision in *Brown*, we conclude that the second *Mathews* factor favors the city.

On the third *Mathews* factor, as we did in *Brown*, we recognize the city's interests in ensuring the proper use of public funds and in avoiding the expense of additional procedures. The third factor thus favors the city.

In sum, we discern no distinguishing facts that would cause us to reach a different conclusion on procedural due process in these appeals than we did in *Brown*. We conclude, as we did in *Brown*, that the first *Mathews* factor favors relators but that the second and third factors favor the city. We therefore conclude that the process afforded to relators was

17

constitutionally sufficient and that the city did not violate relators' rights to procedural due process.

**2**

We turn now to the joint relators' assertion of substantive due-process violations. "[T]he substantive component of the right to due process [protects] an individual from certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *State v. Hill*, 871 N.W.2d 900, 906 (Minn. 2015) (quotation omitted). "[S]ubstantive due process prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty." *Id.* (citations and quotations omitted); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (emphasizing that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense" (quotation omitted)). Minnesota Supreme Court precedent also "establishes that only the most extreme instances of governmental misconduct can satisfy the exacting shocks-the-conscience standard, with these acts often evincing deliberate and unjustifiable injurious intent." *Hill*, 871 N.W.2d at 906 (quotations omitted).

In *Brown*, we concluded that the city did not violate substantive due process. *Brown*, 2025 WL 2901740, at *10. We considered Brown's arguments that the city's decision violated due process because it was not based on substantial evidence, did not give appropriate weight to Brown's evidence, and was arbitrary. *Id.* We rejected these arguments based on our conclusions, later in the opinion, that the city's decision was supported by substantial evidence and was not arbitrary. *Id.*

18

The joint relators advance the same substantive-due-process claims as Brown, and we reject them for the same reasons we rejected Brown's arguments. As we explain in section II, the city's decisions are supported by substantial evidence and are not arbitrary. It follows that the joint relators have not offered a reason to conclude that the city's decisions violated their substantive-due-process rights.[9]

## C

The United States and Minnesota Constitutions provide that no person shall be denied equal protection of the laws. U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 2. In other words, equal protection requires that "individuals who are similarly situated be treated alike unless there is a sufficient basis for distinguishing among them." *Lundberg by Lundberg v. Jeep Corp.*, 582 N.W.2d 268, 271 (Minn. App. 1998). Thus, in evaluating a claimed equal-protection violation, the "threshold inquiry is whether the claimant is similarly situated in all relevant respects to others whom the claimant contends are being

---

[9] Even were we to conclude that the decisions lacked the support of substantial evidence or were arbitrary, that would not be dispositive of the substantive-due-process issue. *See, e.g., Draper v. City of Festus*, 782 F.3d 948, 953 (8th Cir. 2015) ("To be conscience shocking, the government action must be truly irrational, that is, something more than . . . arbitrary, capricious, or in violation of state law." (Quotation omitted.)). And the city's conduct in denying defense and indemnification is incomparable to conduct that has been determined to shock the conscience. *See, e.g., Rochin v. California*, 342 U.S. 165, 172 (1952) (reversing conviction on substantive-due-process grounds when police unlawfully broke into defendant's home, forcibly attempted to extract evidence from defendant's mouth, and pumped defendant's stomach against his will); *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1075-77 (11th Cir. 2000) (vacating dismissal of claim under 42 U.S.C. § 1983 for substantive-due-process violation based on allegations that teacher struck student's face with a metal weight as punishment, resulting in student's loss of an eye); *see also Hill*, 871 N.W.2d at 906-07 n.6 (discussing cases applying conscience-shocking test).

treated differently." *State v. Lee*, 976 N.W.2d 120, 125-26 (Minn. 2022). To meet this requirement, relators generally must "demonstrate that they are part of an 'objectively identifiable' class that is treated differently than a similarly situated class." *Brown*, 2025 WL 2901740, at \*11 (quoting *Forslund v. State*, 924 N.W.2d 25, 35-36 (Minn. App. 2019)).

In *Brown*, we considered Brown's argument that the city had provided defense and indemnification to other police officers who he asserted were similarly situated. *Id.* But we concluded that Brown had neither identified a discrete and identifiable group of which he is a member nor asserted that he was a class of one. *Id.* We thus concluded that his equal-protection claim failed on the threshold inquiry. *Id.*

Here, too, relators fail to identify an "objectively identifiable" class to which they belong that was treated unequally. To support their equal-protection argument, relators rely on a "non-exhaustive" list of 15 cases where the city defended and indemnified officers against what relators characterize as "objectively more egregious allegations than those" brought against relators.[10] But relators do not identify a discrete, identifiable class to which they belong, nor have they shown that they are similarly situated in "all relevant respects" to the officers who received defense and indemnification. *Lee*, 976 N.W.2d at 126. As relators emphasize in other parts of their arguments, determining whether an officer used

---

[10] The city points out that "[t]he plaintiffs in many of the cases that Relators cite never named an officer before the case settled, meaning that the City did not make a defense and indemnification decision." While that may or may not be true, we proceed to analyze relators' equal-protection challenge assuming the city ultimately decided to defend and indemnify the officers involved in those cases.

20

a reasonable level of force is a fact-intensive inquiry. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) (explaining that "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"). Thus, even if those officers who received defense and indemnification used a similar level of force as relators, that level of force may have been reasonable under the circumstances. For this reason, relators fail to satisfy the threshold inquiry, and that failure defeats their equal-protection argument. *Brown*, 2025 WL 2901740, at *11.

## II

We now turn to relators' arguments that the city's defense-and-indemnification decisions are unsupported by substantial evidence and are arbitrary. As a threshold matter, and to clarify the record upon which we conduct our review, we address Severance's motion to supplement the record.

## A

During briefing, Severance moved to supplement the record for his appeal with two transcripts of interviews he gave to the OPCR and a recording of dispatch audio that includes what he characterizes as his "official directive" to strike teams on May 30, 2020. To aid our consideration of this motion, we summarize the nature of a record in a certiorari appeal and motions that may be brought in relation to that record.

"Certiorari is, by its nature, a review based solely upon the record." *Amdahl v. Fillmore County*, 258 N.W.2d 869, 874 (Minn. 1977). The rules of civil appellate procedure provide that "[t]he documents filed in the trial court, the exhibits, and the

21

transcript of proceedings, if any, shall constitute the record on appeal in all cases." Minn. R. Civ. App. P. 110.01. And the rules define "trial court" to include an "agency whose decision is sought to be reviewed." Minn. R. Civ. App. P. 101.02, subd. 4; *see also* Minn. R. Civ. App. P. 115.04 (incorporating the provisions of rule 110, to the extent possible, for certiorari appeals). Consistent with these rules, we have said that an administrative record for a certiorari appeal is "made up of documents submitted to the agency or considered by the agency in reaching its decision." *In re Air Emissions Permit No. 13700345-101 for PolyMet Mining, Inc.*, 943 N.W.2d 399, 406 (Minn. App. 2020), *rev'd on other grounds*, 955 N.W.2d 258 (Minn. 2021). But the appellate rules do not seamlessly translate to the administrative context, particularly when there has not been a contested-case hearing. Thus, we have also determined that pertinent documents that were "available" to a decision-maker at the time of a challenged decision were part of the record on appeal. *Trout Unlimited, Inc. v. Minn. Dep't of Agric.*, 528 N.W.2d 903, 908 (Minn. App. 1995), *rev. denied* (Minn. Apr. 27, 1996).

Court rules and caselaw provide two mechanisms through which a party may seek to include materials in the record that an agency has failed or refused to include. First, a party may bring a motion to correct or complete the record under Minnesota Rule of Civil Appellate Procedure 110.05. "A motion to correct or complete the record under [rule] 110.05 is limited to documents that are 'material to either party' that were omitted from the record 'by error or accident, or . . . misstated in it.'" *In re Issuance of Air Emissions Permit No. 13700345-101 for PolyMet Mining, Inc.*, 955 N.W.2d 258, 264 n.2

22

(Minn. 2021) (quoting Minn. R. Civ. App. P. 110.05).[11] Second, a party may bring a motion to supplement the record, which "seeks to add evidence to the record that the agency did not consider but is 'necessary for the court to conduct a substantial inquiry.'" *Id.*; *see White v. Minn. Dep't of Nat. Res.*, 567 N.W.2d 724, 735 (Minn. App. 1997) (identifying circumstances when courts may consider documents "outside the administrative record").

For these appeals, the city compiled separate records for each of the relators. Each of the records includes the amended complaint from the federal litigation, the governor's emergency executive order setting the citywide curfew, the individual relator's request for defense and indemnification, excerpts from the police department's policy manual, and the city's defense-and-indemnification policy. But some of the records include additional materials. Particularly pertinent here, the record for Stenerson's appeal includes transcripts from his OPCR interview.

By motion, Severance seeks to include in the record for his appeal transcripts of his OPCR interviews regarding the events underlying the federal lawsuit and an audio recording of directives he gave to strike teams on May 30, 2020. Severance fashions his motion as one to supplement the record, but he effectively asserts that the transcripts and

---

[11] Rule 110.05 requires that a request to complete or correct the record be made to the administrative decision-maker in the first instance. And we note that disputes over the record can often be resolved through communications between the parties without the need for court intervention. The record does not reflect that Severance asked the city to correct or supplement the record before seeking relief in this court, but the city's opposition to Severance's motion to supplement the record suggests that it would have denied such a request. Thus, while we emphasize that the proper procedure is to first seek correction from an administrative decision-maker, we exercise our discretion to consider Severance's motion. *See* Minn. R. Civ. App. P. 102, 110.05.

audio recording should have been included in the record for his appeal. He argues that the OPCR transcripts and audio recording were in the city's possession when it made the decision to deny his request for defense and indemnification; that the city included OPCR transcripts in the appeal record for Stenerson while excluding his transcripts; and that, even if the city did not *rely* on the OPCR transcripts and audio recording, it must have *considered* them in reaching its decision.

We agree that the city should have included the OPCR transcripts and audio recordings in the record for appeal. We note that the city appears to have compiled the records for these appeals to include just those documents that it believed necessary to support its decisions. But, as we note above, the record for an administrative appeal is not so limited. *See In re Air Emissions Permit No. 13700345-101 for PolyMet Mining, Inc.*, 943 N.W.2d at 406-07; *Trout Unlimited, Inc.*, 528 N.W.2d at 908. The city does not dispute that Severance's OPCR transcripts and the audio recording of his directives were available to it when it made its decision to deny defense and indemnification to Severance, and the materials are clearly pertinent to the city's decision. The city's choice to not rely on these materials to support its decision does not exclude them from the record. Accordingly, we construe Severance's motion as one to complete the record, and we grant that motion. *See* Minn. R. Civ. App. P. 110.05 (allowing motion to complete the record with documents erroneously omitted).[12]

---

[12] Severance also argues that supplementation of the record is appropriate under the circumstances identified in *White*. Because we construe Severance's motion to also seek completion of the record, we need not address his arguments under *White*.

**B**

Having determined the record on which to conduct our review, we next address relators' arguments that the city's decisions are unsupported by substantial evidence. We begin by setting forth our standard of review and the pertinent legal standards.

The city must support its quasi-judicial decisions with substantial evidence. *AFSCME, Council No. 14 v. County of Ramsey*, 513 N.W.2d 257, 259 (Minn. App. 1994); *see also Dietz*, 487 N.W.2d at 239 (allowing appellate review for whether an agency decision is "without any evidence to support it" (quotation omitted)). Substantial evidence is "1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than some evidence; 4) more than any evidence; and 5) evidence considered in its entirety." *AFSCME*, 513 N.W.2d at 259 (quotation omitted). In engaging in this review, appellate courts must not "substitute [their] own findings of fact for those of a city" nor "engage in a de novo review of conflicting evidence." *Sawh*, 823 N.W.2d at 635.

To evaluate the record support for the city's decisions, we must consider the legal standards governing those decisions. Under Minnesota Statutes section 466.07, subdivision 1,

> a municipality or an instrumentality of a municipality shall defend and indemnify any of its officers and employees, whether elective or appointive, for damages, including punitive damages, claimed or levied against the officer or employee, provided that the officer or employee:
>> (1) was acting in the performance of the duties of the position; and
>> (2) was not guilty of malfeasance in office, willful neglect of duty, or bad faith.

Under this standard, the city properly denied defense and indemnification if relators' conduct underlying the federal lawsuit constituted malfeasance in office, willful neglect of duty, or bad faith. We first address whether the record supports the city's determinations that relators willfully neglected their duties. And because we conclude that the record supports those determinations, we do not reach the city's determinations that relators also were guilty of malfeasance and bad faith.

The phrase "willful neglect of duty" is not defined in Minnesota Statutes section 466.07, subdivision 1, or related statutory provisions. *See* Minn. Stat. §§ 466.01-.15 (2024).[13] Absent a statutory definition, we seek to discern the common meaning of the phrase, and we may find guidance in dictionary definitions. *See T.G.G. v. H.E.S.*, 946 N.W.2d 309, 315 (Minn. 2020). We may also rely on previous cases that have construed the phrase. *See, e.g.*, *Phone Recovery Servs., LLC v. Qwest Corp.*, 919 N.W.2d 315, 320 (Minn. 2018) (relying on past case in defining statutory term).

The parties point us to *In re Olson*, wherein the supreme court defined "neglect of duty" as "a careless or intentional failure to exercise due diligence in the performance of an official duty." 300 N.W. 398, 400 (Minn. 1941). This definition is consistent with dictionary definitions of "neglect." *See, e.g.*, *The American Heritage Dictionary of the English Language* 1179 (5th ed. 2018) (defining neglect to mean "[t]o fail to care for or

---

[13] Minnesota Statutes section 466.07, subdivision 1, is part of the state's municipal tort claims act, which provides that municipalities are liable for their torts, with certain exceptions. *See* Minn. Stat. §§ 466.02-.03. The act includes a definitions section, Minn. Stat. § 466.01, but does not define "willful neglect of duty" in that section or any other section.

attend to properly" and "[t]o fail to do or carry out, as through carelessness or oversight"). But the statutory standard for denying defense and indemnification requires that there be a "*willful* neglect of duty." Minn. Stat. § 466.07, subd. 1 (emphasis added). "Willful neglect" has been defined in the legal context as the "[i]ntentional or reckless failure to carry out a legal duty." *Black's Law Dictionary* 1241 (12th ed. 2024). Synthesizing *Olson*'s definition with the plain meaning of this statute, we conclude that officials willfully neglect their duties when they intentionally or recklessly fail to exercise due diligence in the performance of their official duties. With that definition in mind, we turn to evaluating whether the city's determinations that relators willfully neglected their duties are supported by substantial evidence.

We first conclude that the city has adequately explained its reasons for denying defense and indemnification to relators. The city found that, on the evening of May 30, 2020, Severance gave Bittell and other officers instructions authorizing the "indiscriminate" and "excessive" use of force, including Severance's instruction to "f--k 'em up, gas 'em, f--k 'em up." They city also found that Bittell instructed CART 1281 upon arriving at the gas station to "[l]et 'em have it boys, let them have it!" And that Bittell gave that instruction despite having "had no communication or interaction with the Plaintiffs" in the federal lawsuit and "[in]sufficient time to observe what Plaintiffs were doing." The city also found that "[t]he available evidence does not show that Bittell could have reasonably believed Plaintiffs were looting nor that he engaged in any due diligence to determine that the shooting of 40-mms was reasonable under the circumstances." The city's finding also included that Severance's and Bittell's instructions did not clarify that

27

they "meant anything other than authorization to use excessive physical force indiscriminately against groups of people," which made other officers' indiscriminate use of force foreseeable. And the city found that the directives to use indiscriminate and excessive force violated police department policy, which "explicitly provides that '[s]upervisors are responsible for the behavior and actions of subordinates within their immediate control.'" Therefore, the city concluded that Severance and Bittell's conduct constituted willful neglect of duty.

With respect to Cushenbery and Dauble, the city found that they shot 40mm munitions from the van, which was about 30 feet from the individuals at the gas station, without knowledge that such use of force was reasonable under the circumstances. The city explained that, given "the distance between [the officers] and Plaintiffs" and "the absence of any interaction or meaningful opportunity for observation," the officers "could not have known, when [they] began shooting, whether any of the people at the gas station were exempt from curfew." And the city found that "violation of the curfew was not an offense serious enough to warrant this level of force." Based on these findings, the city concluded that Cushenbery's and Dauble's use of force also constituted willful neglect of duty.

Finally, as to Stenerson, the city found that he sprayed chemical irritant on at least one journalist who was lying face down on the ground and identified himself as a member of the press. The city found that the journalist was not "resisting arrest, trying to flee, or engaging in any physical aggression," which are the only circumstances under which police department policies permit officers to use chemical irritant. The city noted Stenerson's concession that he "just maced whoever [he] came in . . . contact" with, without making

28

any attempts to determine whether the individuals he sprayed were exempt from curfew. Based on these findings, the city concluded that Stenerson's conduct constituted willful neglect of duty.

Relators do not assert that any of the city's findings about the events that occurred on May 30, 2020, are unsupported by the record, and our own review of the record persuades us that the findings have adequate evidentiary support.[14] But relators argue that the force that they used on May 30, 2020, was reasonable under the circumstances and thus that they did not violate police department policy or willfully neglect their duties. They assert that the city failed to consider the context of the widespread unrest in the days after the murder of George Floyd. In that context, the joint relators assert, a reasonable officer was one "who had been working 20 hours per day, under extremely high stress due to multiple instances of use of force against [Minneapolis police] officers, including shots fired, [and who had been] watching the City fall to violent attacks by criminals." Severance also asserts that the city failed to consider the instructions he gave to officers on the street in the context of his "official directive" made over dispatch radio and failed to take into account his explanations in the OPCR interviews about why he used the words he used. We are not persuaded that relators' emphasis on these record materials renders the city's decision unsupported by substantial evidence.

---

[14] Through the joint relators' brief, Dauble maintains that he "does not recall deploying a 40mm round nor using any force during the incident." Even so, the joint relators do not appear to challenge the sufficiency of the record's support for the city's finding that Dauble engaged in indiscriminate use of force.

Under our substantial-evidence review, we are not in a position to reweigh the evidence to reach a different conclusion. *See Staeheli*, 732 N.W.2d at 312; *see also Sawh*, 823 N.W.2d at 635. There is evidence in the records for these appeals—in particular the footage from multiple officers' body-worn cameras—to support the city's determinations that relators ordered and used excessive and indiscriminate force in violation of the police department's policies and that, in doing so, relators intentionally or recklessly failed to exercise due diligence in the performance of their official duties. Relators do not explain how, even in the context of the extraordinary circumstances in May 2020, the circumstances so clearly justified this indiscriminate use of force that they render the city's determinations unsupported. After all, the city was aware of the context and implicitly determined that it did not justify relators' conduct. Adhering to our standard of review, which grants "[s]ubstantial judicial deference . . . to administrative fact-finding," we do not discern a basis on these records to upend the city's determinations. *Staeheli*, 732 N.W.2d at 310.

Stenerson separately argues that the city's decision to deny him defense and indemnification is not supported by substantial evidence because he asserts that he did not spray chemical irritant at any of the plaintiffs in the federal lawsuit. We take no position on whether that assertion may provide Stenerson a defense in the federal litigation; but the standard for the city to deny defense and indemnification does not depend on the outcome of the claims against Stenerson. *See* Minn. Stat. § 466.07, subd. 1. For purposes of our certiorari review, we conclude that substantial evidence supports the city's determination

that Stenerson willfully neglected his duties by using excessive and indiscriminate force at the time of the events underlying the federal litigation.

In sum, the record supports the city's determinations that relators used excessive and indiscriminate force and thereby willfully neglected their duties. We therefore reject relators' arguments that the city's decisions are unsupported by substantial evidence.

## C

We lastly address relators' arguments that the city's decisions are arbitrary. An administrative decision-maker engages in arbitrary decision-making when it (1) relies "on factors which the legislature had not intended it to consider," (2) "entirely fail[s] to consider an important aspect of the problem," (3) "offer[s] an explanation for the decision that runs counter to the evidence," or (4) reaches a decision that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Minn. Transitions Charter Sch. v. Comm'r of the Minn. Dep't of Educ.*, 844 N.W.2d 223, 235 (Minn. App. 2014) (quoting *Trout Unlimited, Inc.*, 528 N.W.2d at 907).

In arguing for reversal on the basis that the city's decision is arbitrary, relators primarily repackage arguments made in relation to other bases for reversal. The joint relators assert that the city failed to consider an important aspect of the issue because it did not investigate the allegations in the federal lawsuit, because relators' use of force was reasonable under the circumstances, and because other officers have been granted defense and indemnification in cases involving 40mm munitions. Severance argues the city imposed a burden on him to make a record and failed to support its decision with substantial

evidence.[15] We have concluded that the city did not assign a burden of proof on relators; that the city's procedure did not violate relators' due-process rights; that substantial evidence supports the city's determinations that relators used excessive and indiscriminate force; and that relators have not established an equal-protection violation. And we are not persuaded that the city failed to consider any important aspect of the issue or otherwise acted arbitrarily. We therefore conclude that relators have not established that the city's determinations were arbitrary.

**Affirmed; motion granted.**

---

[15] Severance also challenges as arbitrary the city's alternative basis for denying his request for defense and indemnification: that he failed to comply with the city's procedure. Because we affirm the city's denial of defense and indemnification on substantive grounds, we need not reach Severance's arguments regarding the city's alternative, procedural ground.